THE HAJMM COMPANY v. HOUSE OF RAEFORD FARMS, INC.; E. MARVIN JOHNSON

No. 271A89

(Filed 2 May 1991)

1. **Evidence § 47 (NCI3d) — expert testimony on ultimate issues — erroneously admitted — not prejudicial**

There was no prejudicial error in an action arising from defendants' refusal to redeem a revolving fund certificate in the admission of expert testimony that there was a fiduciary relationship, that defendants breached their duty, and that the Raeford board abused its discretion. Whether there was a fiduciary relationship was the ultimate jural relationship at issue, whether the fiduciary duty was breached was the ultimate legal conclusion, and whether the board abused its discretion involved the satisfaction of the ultimate legal standard. The underlying factual components were the proper subject of expert opinion testimony, but the witness should not have been permitted to give his opinion on the existence of a fiduciary relationship, the breach of the relationship, and the abuse of discretion. However, admission of the testimony was harmless because other substantial admissible testimony, together with documentary evidence, was compelling in favor of plaintiff. N.C.G.S. § 8C-1, Rules 702 and 704.

**Am Jur 2d, Securities Regulation—Federal §§ 35 et seq.; Securities Regulation—State §§ 11 et seq.**

2. **Unfair Competition § 1 (NCI3d) — revolving fund certificate — failure to redeem — unfair practices not applicable**

The trial court properly granted a dismissal under N.C.G.S. § 1A-1, Rule 12(b)(6) of an unfair practices claim arising from the failure to redeem a revolving fund certificate. Revolving fund certificates are, in essence, corporate securities and N.C.G.S. § 75-1.1 does not apply to securities transactions. Securities transactions are pervasively regulated by other state statutes, federal statutes, and agencies, and securities transactions are related to the creation, transfer, or retirement of capital and are not business activities as that term is used in the Act.

HAJMM CO. v. HOUSE OF RAEFORD FARMS

[328 N.C. 578 (1991)]

**Am Jur 2d, Securities Regulation—Federal §§ 35 et seq.; Securities Regulation—State §§ 11 et seq.**

Justice MARTIN dissenting in part.

APPEAL by defendants pursuant to N.C.G.S. § 7A-30(2) from a decision by a divided panel of the Court of Appeals, 94 N.C. App. 1, 379 S.E.2d 868 (1989), finding no error in a verdict and judgment rendered at the 14 December 1987 session of Superior Court, SCOTLAND County, *Phillips, J.,* presiding. Defendants' petition for discretionary review was allowed as to an additional issue. Heard in the Supreme Court 13 December 1989.

*Adams, McCullough & Beard, by William H. McCullough, Charles C. Meeker, and John J. Butler, for plaintiff-appellee.*

*Petree Stockton & Robinson, by G. Gray Wilson and R. Rand Tucker, for defendant-appellants.*

EXUM, Chief Justice.

This is an action seeking compensatory, punitive and treble damages for breach of fiduciary duty, breach of corporate bylaws, and unfair or deceptive acts or practices in or affecting commerce (unfair practices) based on defendants' allegedly improper refusal to redeem a certain "revolving fund certificate" issued by the corporate defendant (Raeford) to plaintiff. The trial court dismissed the claim for unfair practices under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure.[1] The other claims were tried before a jury,[2] which returned a verdict granting compensatory damages against both defendants and punitive damages against Raeford. From judgment entered on the verdict defendants appealed. Plaintiff appealed from the dismissal of its unfair practices claim.

The Court of Appeals found no error in the trial, but reversed the dismissal of plaintiff's unfair practices claim and remanded it for trial. Judge Greene dissented, believing that during the jury trial the court improperly admitted certain expert testimony to

---

1. This claim was dismissed at the 4 August 1986 session of Superior Court, Scotland County, Hairston, J., presiding.

2. The trial was conducted at the 14 December 1987 session of Superior Court, Scotland County, Phillips, J., presiding.

the prejudice of defendants. Defendants' appeal to us is based on this dissent and raises the question of the admissibility of the expert testimony. We allowed in part defendants' petition for discretionary review to consider only the question whether the Court of Appeals correctly concluded that plaintiff stated a claim for unfair practices under N.C.G.S. § 75-1.1.

We conclude that the challenged expert testimony should not have been admitted but the error in admitting it was harmless. We also conclude that N.C.G.S. § 75-1.1 was not intended to apply to the transaction in question and plaintiff has not, therefore, stated a claim for unfair practices. We consequently modify and affirm in part and reverse in part the Court of Appeals' decision.

## I.

Evidence at trial tends to show the following:

Plaintiff is a North Carolina limited partnership engaged in agricultural marketing. The partnership is composed of members of the Evans family from Laurinburg. HAJMM is an acronym formed from the first names of five Evans siblings — Hervey, Ann, John, McNair and Murphy.

Defendant Raeford is an incorporated North Carolina agricultural cooperative engaged in the business of processing turkeys and other poultry. Defendant Johnson is president and chairman of its board of directors. He runs the company. According to his testimony, "[t]he final decision is mine" with regard to Raeford's business.

Raeford was formed in 1975. It was capitalized in part when plaintiff and two other turkey producers sold to Raeford all their stock in Raeford Turkey Farms, Inc. (RTF). The other two selling turkey producers were Stone Brothers, Inc. (Stone Brothers), and Nash Johnson and Sons, Inc. (NJS). Defendant Johnson and his sisters own NJS, which provides over ninety percent of Raeford's turkeys.

As part of the consideration for selling their interests in RTF to Raeford, plaintiff and the other turkey producers received "Class B — Series 1975" revolving fund certificates issued by Raeford. The certificates became part of Raeford's capital structure and are shown as stockholder's equity on Raeford's balance sheet.

Plaintiff's certificate recites that plaintiff "has furnished $387,500 . . . in value to [Raeford]." The certificate also recites that it "shall bear no interest," is "junior and subordinate to all debts" of the company, is subject to the company's bylaws, which are incorporated by reference, and is "retirable in the sole discretion of the board of directors, either fully or on a pro rata basis." The certificate bears no maturity date.

An identical certificate was issued to Stone Brothers for its RTF stock. NJS received a certificate with like terms but with a face value of $750,000.

With regard to the revolving fund certificates, Raeford's bylaws provide in part: "Funds arising from the issue of such certificates shall be used for creating a revolving fund for the purpose of building up such an amount of capital as may be deemed necessary by the board of directors from time to time and for revolving such capital." The bylaws also provide that "[s]uch certificates shall be issued in annual series . . . and each series shall be retired fully or on a prorata basis, only at the discretion of the board . . . in the order of issuance by years as funds are available for that purpose."

During 1978 Raeford retired the revolving fund certificate originally issued to Stone Brothers but which Stone Brothers had by then transferred to FCX, Inc. No value was placed on the certificate when it was retired. This retirement was a component of Raeford's purchase of all interest FCX then held in Raeford and was shown on Raeford's books by discounting the certificate to zero value.

Some time later Raeford retired the NJS certificate. Retirement of this certificate was also shown on Raeford's books by discounting the certificate to zero value.

Plaintiff's certificate was not retired and continued to be carried on Raeford's books as part of Raeford's capital structure. In March 1986 plaintiff demanded payment on the certificate and Raeford refused.

According to plaintiff's evidence defendant Johnson told Hervey Evans that Raeford would never pay the certificate. Johnson told an attorney representing the Federal Land Bank, "[i]t's not bearing interest, so there's really no reason to pay it. It's sort of like owing money to yourself." According to defendant Johnson, Raeford

had refused to pay off the certificate because it "wasn't good business." He conceded he had said he might never pay the certificate.

Plaintiff's evidence also showed that Raeford had been profitable throughout the mid-1980's. For example, the fiscal year ending 31 May 1986 yielded Raeford $6.1 million in net income and brought its net worth to over $18 million. Raeford's net worth had been only $6.8 million in 1983.

As of 1986 Raeford had loaned $375,000 to Johnson and over $1.1 million to other businesses owned by the Johnson family. In fiscal year 1987 Raeford purchased a jet airplane for over $800,000. By the end of the year, Raeford held $3.4 million in outside securities and had $922,000 cash on hand. Despite these loans, purchases, and liquidity, defendant Raeford refused to retire plaintiff's $387,500 revolving fund certificate.

Defendants' evidence sought primarily to justify the refusal to pay plaintiff's revolving fund certificate.

At the close of the evidence, the trial court submitted issues to the jury and received the following answers:

1. Did the defendant, House of Raeford Farms, Inc., breach its bylaws by refusing to retire the revolving fund certificate of the plaintiff, HAJMM, in the reasonable exercise of its discretion?

Yes.

2. Did the defendant, House of Raeford Farms, Inc., breach its bylaws by retiring any of the revolving fund certificates in the same annual series as that of plaintiff, HAJMM, and refusing to retire that of the plaintiff, HAJMM?

Yes.

3. Do the defendants, E. Marvin Johnson and Raeford Farms, Inc., owe a fiduciary duty to the plaintiff, HAJMM?

Yes.

4. If so, was their refusal to retire HAJMM's revolving fund certificate an open, fair and honest transaction?

No.

5. In what month and year did the breach or violation occur?

March, 1986.

6. In your discretion what amount of punitive damages, if any, should be awarded to the plaintiff, HAJMM from the defendant E. Marvin Johnson?

None.

7. In your discretion, what amount of punitive damages, if any, should be awarded to the plaintiff, HAJMM from the defendant, House of Raeford Farms, Inc.?

$100,000.

Upon this verdict the trial court entered judgment ordering defendants, jointly and severally, to pay plaintiff $387,500 as compensatory damages and ordering defendant Raeford to pay plaintiff $100,000 in punitive damages.

On defendants' appeal a majority of the Court of Appeals panel found no error in the trial. Judge Greene dissented, believing that the trial court erred by allowing an expert witness to testify that Raeford's Board of Directors "abused its discretion" and that defendants owed plaintiff a "fiduciary duty," which they breached. Defendants appeal to us as of right on the basis of the dissent.

On plaintiff's appeal, the Court of Appeals reversed and vacated the trial court's order granting defendants' Rule 12(b)(6) motion to dismiss the unfair practices claim and remanded for trial on that issue.

We granted defendants' petition for discretionary review to consider only the unfair practices claim issue.

## II.

[1] The first question we address is whether there was reversible error in the admission of certain expert testimony. The Court of Appeals concluded there was no error. We conclude there was error but that it was not so prejudicial as to warrant a new trial.

Dr. James Baarda was qualified as an expert witness on equity redemption by agricultural cooperatives. Defendants made timely objections to the following portions of his direct testimony:

Q: [By plaintiff's counsel] Based upon your experience and your review of the materials as to what you have previously testified and identified, do you have an opinion satisfactory to yourself, as to whether the Board of Directors of Raeford, abused their [sic] discretion in failing to redeem HAJMM's Class B Revolving Fund Certificate?

A: [By Dr. Baarda] Yes, I do have an opinion.

Q: What is that opinion?

A: [M]y opinion is that the Board of Directors did abuse its discretion in failing to redeem this equity.

\* \* \* \* \*

Q: Do you have an opinion satisfactory to yourself, as to whether there was a fiduciary duty [owed] both by Raeford and the defendant, Marvin Johnson, to the HAJMM Company?

A: Yes, I do.

Q: What is that opinion?

A: In my opinion . . . there was such a relationship.

\* \* \* \* \*

Q: Do you have an opinion satisfactory to yourself as to whether the fiduciary duty was breached?

A: Yes.

Q: What is that?

A: I believe that the fiduciary duty was breached.

\* \* \* \* \*

Q: Do you have an opinion satisfactory to yourself, as to when the fiduciary duty was breached?

A: I believe it was breached when the Evans family made demand on the cooperative to pay it back, and the cooperative refused to do so.

Q: Do you have an opinion satisfactory to yourself as to whether this breach is continuous?

A: Yes, this, this is a continuing duty.

## HAJMM CO. v. HOUSE OF RAEFORD FARMS

[328 N.C. 578 (1991)]

(Objections and objections to the line of questioning omitted.)

Defendants contend that Dr. Baarda should not have been permitted to give his opinion that they were plaintiff's fiduciaries, that they breached their fiduciary duties to plaintiff, or that Raeford's board abused its discretion by failing to redeem plaintiff's certificate. We agree with defendants.

To decide this issue, we first examine the Rules of Evidence and pertinent case law. We also discuss the policies underlying the admission or exclusion of certain types of opinion testimony.

Expert testimony is admissible under North Carolina Evidence Rule 702, which provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion.

N.C.G.S. § 8C-1, Rule 702.

Under Rule 704 "[t]estimony in the form of an opinion or inference is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." N.C.G.S. § 8C-1, Rule 704. Rule 704 comports with and codifies North Carolina's common law:

> [I]n determining whether expert . . . opinion is to be admitted into evidence the inquiry should be not whether it invades the province of the jury, but whether the opinion expressed is really one based on the special expertise of the expert, that is, whether the witness because of his expertise is in a better position to have an opinion on the subject than is the trier of fact.

State v. Wilkerson, 295 N.C. 559, 568-69, 247 S.E.2d 905, 911 (1978).

There are, nevertheless, limits on the admissibility of expert opinion testimony. The advisory committee note to Rule 704 states:

> The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurance against the admission of opinions which would merely tell the jury what result to reach,

somewhat in the manner of the oath-helpers of an earlier day. They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria.

N.C.G.S. § 8C-1, Rule 704 advisory committee's note.

Our cases interpreting Rule 704 are to the same effect. "[U]nder the . . . rules of evidence, an expert may not testify that a particular legal conclusion or standard has or has not been met, at least where the standard is a legal term of art which carries a specific meaning not readily apparent to the witness." *State v. Ledford*, 315 N.C. 599, 617, 340 S.E.2d 309, 321 (1986) (error, but not prejudicial, to admit expert opinion that certain injuries were the "proximate cause" of death).

The distinction between legal standards and conclusions about which testimony may not be admitted, and ultimate facts about which testimony is admissible, is often difficult to draw. The advisory committee's note to Rule 704 gives a helpful example of the difference:

[T]he question, "Did [the testator] have capacity to make a will?" would be excluded, while the question, "Did [the testator] have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" would be allowed.

N.C.G.S. § 8C-1, Rule 704 advisory committee's notes. This example illustrates the kind of opinion testimony, expert or not, that should be excluded by the rules as well as the kind of testimony that should be admitted under them. The term " ' "[testamentary capacity]" is a conclusion which the law draws from certain facts as premises.' " *In re Will of Tatum*, 233 N.C. 723, 728, 65 S.E.2d 351, 354 (1951) (quoting *In re Will of Lomax*, 224 N.C. 459, 462, 31 S.E.2d 369, 370 (1944) ). In the example given, opinion testimony would be allowed regarding the underlying *factual premises* the jury must consider in determining whether testamentary capacity exists, facts including the testator's ability to know the nature and extent of his property, to know the natural objects of his bounty, and to formulate a rational distribution scheme. Opinion testimony could not be offered on whether the *legal conclusion* that testamentary capacity existed should be drawn.

We have applied this distinction between a legal standard, or conclusion, and its factual premises in other contexts. In *State*

*v. Shank*, 322 N.C. 243, 367 S.E.2d 639 (1988), we held that it was reversible error for the trial court to exclude evidence offered by the defendant's expert that the "defendant's diminished mental capacity affected his ability to make and carry out plans." *Id.* at 246, 367 S.E.2d at 643. This testimony was directed to facts, even if regarded as ultimate facts, which were relevant to whether the legal conclusion that defendant premeditated and deliberated should be drawn. In *State v. Rose*, 323 N.C. 455, 373 S.E.2d 426 (1988), we held that the trial court correctly excluded a psychiatrist's testimony that the defendant was incapable of "premeditation and deliberation" because the proffered evidence went to whether a legal conclusion should be drawn. *See also State v. Weeks*, 322 N.C. 152, 367 S.E.2d 895 (1988). *See generally* Note, *Mental Impairment and Mens Rea: North Carolina Recognizes the Diminished Capacity Defense in State v. Shank and State v. Rose*, 67 N.C.L. Rev. 1293 (1989).

From the Rules of Evidence, the advisory committee's notes, case law, and commentaries, we discern two overriding reasons for excluding testimony which suggests whether legal conclusions should be drawn or whether legal standards are satisfied. The first is that such testimony invades not the province of the jury but "the province of the court to determine the applicable law and to instruct the jury as to that law." *F.A.A. v. Landy*, 705 F.2d 624, 632 (2d Cir. 1983), *cert. denied*, 464 U.S. 894, 78 L. Ed. 2d 232 (1983). It is for the court to explain to the jury the given legal standard or conclusion at issue and how it should be determined. To permit the expert to make this determination usurps the function of the judge. The second reason is that an expert is in no better position to conclude whether a legal standard has been satisfied or a legal conclusion should be drawn than is a jury which has been properly instructed on the standard or conclusion.

Ultimate jural relationships at issue are like legal standards and conclusions. It is improper to admit expert opinion testimony as to whether these relationships exist. "[W]here the legal relations growing out of the facts are in dispute, and the witness's words appear to describe the relations themselves, the same words may be objectionable." 1 H. Brandis, *Brandis on North Carolina Evidence* § 130 (3d ed. 1988). The expert may, however, give testimony regarding the existence of the underlying factual component of the relationship. The jury, after hearing the opinion testimony and

upon proper instructions from the court, is in as good a position as the expert to say whether the relationship exists.

We now turn to the legal standards and jural relationships in this case. A fiduciary relationship "may exist under a variety of circumstances; it exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Stone v. McClam*, 42 N.C. App. 393, 401, 257 S.E.2d 78, 83, *disc. rev. denied*, 298 N.C. 572, 261 S.E.2d 128 (1979) (quoting *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931)). Business partners, for example, are each other's fiduciaries as a matter of law. *Casey v. Grantham*, 239 N.C. 121, 79 S.E.2d 735 (1954). In less clearly defined situations the question whether a fiduciary relationship exists is more open and depends ultimately on the circumstances. Courts have historically declined to offer a rigid definition of a fiduciary relationship in order to allow imposition of fiduciary duties where justified. *Abbitt v. Gregory*, 201 N.C. 577, 160 S.E. 896. Thus, the relationship can arise in a variety of circumstances, *id.*, and may stem from varied and unpredictable factors.

A qualified expert such as Dr. Baarda should be permitted under Evidence Rule 704 to give an expert opinion regarding the existence of these factors. For example, the expert witness may give an opinion that under the circumstances one party has reposed special confidence in another party, or that one party should act in good faith toward another party, or that one party must act with due regard to the interests of another party. However, the witness may not opine that a fiduciary relationship exists or has been breached. The trial judge should instruct the jury with regard to factors which give rise to the relationship. The jury so instructed is then in as good a position as the expert to consider the factors and determine whether the fiduciary relationship exists.

Likewise, the discretion vested in a board of directors arises from a variety of sources and circumstances, including statutes, corporate charters, bylaws, resolutions and agreements. Whether such discretion has been abused depends on numerous factors. One such factor prominent in the case before us was the availability of funds with which to retire plaintiff's certificate. Experts may give opinions regarding the existence of these underlying factors, such as, for example, the availability of funds, but they may not

opine whether a board abused its discretion. Again the trial court should instruct on the legal significance of the underlying factors to which testimony has been offered. The jury so instructed is then in as good a position as the expert to consider the factors before it and determine whether the abuse of discretion standard has been satisfied.

Applying the foregoing principles to Dr. Baarda's challenged testimony, we conclude that he should not have been permitted to give his opinion that there was a fiduciary relationship between plaintiff and defendants, that the defendants breached their fiduciary duty, and that the Raeford board abused its discretion. Whether there was a fiduciary relationship was the ultimate jural relationship at issue. Whether the fiduciary duty was breached was the ultimate legal conclusion, and whether the board abused its discretion involved the satisfaction or not of the ultimate legal standard. The jural relationship, the legal conclusion and the legal standard each have various underlying factual components, the existence of which were the proper subject of expert opinion testimony. The jury heard this fact-oriented testimony and, having been properly instructed on the legal significance of the underlying factual components, was in as good a position as the expert to determine whether the jural relationship existed, whether the legal conclusion should be drawn, and whether the legal standard was satisfied.

Though the Court of Appeals incorrectly determined that Dr. Baarda's challenged testimony was admissible, we conclude that its admission was harmless error. In civil cases, "[t]he burden is on the appellant not only to show error but to enable the court to see that he was prejudiced or the verdict of the jury probably influenced thereby." *Board of Education v. Lamm*, 276 N.C. 487, 492, 173 S.E.2d 281, 285 (1970). Erroneous admission of evidence is not prejudicial when its import is established by other, admissible testimony, or where the erroneously admitted testimony is merely cumulative or corroborative. *Lamm*, 276 N.C. 487, 173 S.E.2d 281. To establish prejudice and be entitled to a new trial, the appellant must show there is a reasonable probability that he would have received a favorable verdict had the error not occurred. *Gregory v. Lynch*, 271 N.C. 198, 155 S.E.2d 488 (1967); *Mayberry v. Coach Lines*, 260 N.C. 126, 131 S.E.2d 671 (1963).

Applying these principles, we conclude defendants have failed to establish that Dr. Baarda's inadmissible testimony was prejudicial.

The substantial admissible testimony of Dr. Baarda, Hervey Evans, and others, together with the documentary evidence, is compelling in favor of plaintiff on the existence of a fiduciary relationship, breach of fiduciary duty and abuse of discretion. It also provides a solid basis for the award of punitive damages.[3]

The jury's determination on the fiduciary relationship issue rested on substantial and compelling competent evidence that plaintiff placed special confidence and trust in defendants when it agreed to accept the revolving fund certificate in return for its interest in RTF and that, with regard to the certificate, plaintiff justifiably expected defendants to deal fairly. It rested also on the factual characteristics of the certificate itself, about which there is little or no dispute. The dispute regarding the certificate has revolved around the legal effect to be given its characteristics. Plaintiff has contended the certificate evidences enough of an equity interest in Raeford to lead as a matter of law to the creation of a fiduciary relation between the parties. Defendant has contended the certificate evidences merely a creditor-debtor relation out of which no fiduciary relation can arise. The Court of Appeals resolved these conflicting legal contentions favorably to plaintiff. We elected not to review this aspect of the Court of Appeals' opinion; it thus becomes the law of the case.

The upshot is that Dr. Baarda's conclusion that there was a fiduciary relation between the parties, standing alone, had little or nothing to do with the ultimate determination of this issue for plaintiff. This determination rested more directly on other competent and compelling evidence favorable to plaintiff and the legal effect of the revolving fund certificate's characteristics.

With regard to breach of fiduciary duty and abuse of discretion issues, there was also substantial and compelling evidence that defendant Raeford abused its discretion and that both defendants breached their fiduciary duties by not retiring the certificate.[4] Dr.

---

3. We note the jury's answer to issue number 2 provides a sufficient, independent basis for sustaining the award of compensatory damages. Dr. Baarda's challenged testimony did not bear on this issue. We discuss its prejudicial effect nevertheless on the other issues because they are all intertwined with and may have affected the punitive damages award.

4. No issue specifically using the term "breach of fiduciary duties" was submitted to the jury. However, the jury was asked to determine whether defendants owed plaintiff a fiduciary duty. If the jury so found, it was then required to deter-

Baarda was properly determined by the trial court to be an expert in cooperative financing. He gave five guiding reasons for a cooperative to retire its revolving fund certificates at a given time and five reasons not to retire them. He testified that all five reasons favoring retirement were present in this case, and that none of the reasons against retirement were present.

Dr. Baarda testified, largely without contradiction, that of great importance to determinations about retirement of revolving fund certificates is the financial status of the cooperative. During the time plaintiff demanded that defendants retire plaintiff's certificate, Raeford was enjoying financial success. Raeford had enough financial wherewithal to loan over $1 million to defendant Johnson and his family's other businesses. It had the ability to make large purchases, such as a corporate jet. Raeford's net worth had increased from $6.8 million in 1983 to over $18 million by 31 May 1986. By the end of fiscal year 1987, Raeford had $3.4 million invested in outside securities and $922,000 cash on hand. Raeford's liquidity was extremely high. The evidence regarding Raeford's financial circumstances during the period in question was largely uncontradicted.

Defendants' evidence did not challenge plaintiff's version of Raeford's objective financial condition. It tended in more conclusory fashion to justify defendants' refusal to retire plaintiff's certificate. Even defendants' own expert, improperly as we have shown, gave his opinion that defendants' refusal to retire the certificate was not an "abuse of discretion."

Given this state of the evidence, we are confident the jury did not base its verdict on conflicting, conclusory and improperly admitted expert opinions regarding whether a legal standard had been satisfied, but rather based its verdict on the largely uncontradicted facts regarding Raeford's objective financial condition and its financial ability to retire plaintiff's certificate.

The state of the evidence is such that we are confident the challenged expert testimony had little bearing not only on the liability issues but also on the award of punitive damages. To make the award, the jury under the trial court's instruction must have

mine whether defendants had engaged in an "open, fair and honest" transaction. Given the context of the issues, the latter question is the equivalent of asking the jury whether defendants had breached their fiduciary duties.

considered Raeford's conduct to be "outrageous." The jury was undoubtedly moved in plaintiff's favor by Johnson's testimony that after plaintiff made demand, Johnson and other Raeford directors, including Johnson family members, "had us a little meeting and decided that we didn't need to bother with it; it shouldn't be paid, it wasn't good business and we didn't do it." Johnson even acknowledged that he said he might never pay the certificate.

Defendants, therefore, have failed to establish a reasonable probability that the verdict would have been favorable to them had the error in admitting Dr. Baarda's challenged testimony not been committed. Because the error was harmless, we modify accordingly and affirm the decision of the Court of Appeals on this issue.

### III.

[2] We now consider whether the trial court properly dismissed plaintiff's unfair practices claim under Civil Procedure Rule 12(b)(6). Plaintiff contends defendants' refusal to retire plaintiff's revolving fund certificate constitutes unfair practices under N.C.G.S. § 75-1.1 (the Act), entitling it to treble damages, N.C.G.S. § 75-16, and attorneys' fees, N.C.G.S. § 75-16.1. We disagree and conclude this claim was properly dismissed.

The Act provides: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C.G.S. § 75-1.1(a). The Act was clearly intended to benefit consumers, *Pearce v. American Defender Life Ins. Co.*, 316 N.C. 461, 343 S.E.2d 174 (1986), but its protections extend to businesses in appropriate contexts. *See United Laboratories, Inc. v. Kuykendall*, 322 N.C. 643, 370 S.E.2d 375 (1988). Thus, plaintiff's status as a business partnership does not remove it from the Act's protection.

For plaintiff to be entitled to the Act's remedies, it must show that defendants' conduct falls within the statutory framework allowing recovery. Plaintiff must first establish that defendants' conduct was "in or affecting commerce" before the question of unfairness or deception arises. *Johnson v. Insurance Co.*, 300 N.C. 247, 266 S.E.2d 610 (1980).

This rule requires the Court to interpret the word "commerce." The Act provides that "[f]or purposes of this section, 'commerce' includes all business activities, however denominated, but does not include professional services rendered by a member of a learned

## HAJMM CO. v. HOUSE OF RAEFORD FARMS

[328 N.C. 578 (1991)]

profession." N.C.G.S. § 75-1.1(b). Although this statutory definition of commerce is expansive, the Act is not intended to apply to all wrongs in a business setting. For instance, it does not cover employer-employee relations, *Buie v. Daniel International*, 56 N.C. App. 445, 289 S.E.2d 118, *disc. rev. denied*, 305 N.C. 759, 292 S.E.2d 574 (1982), or securities transactions, *Skinner v. E. F. Hutton & Co.*, 314 N.C. 267, 333 S.E.2d 236 (1985).

In *Skinner* we held that "securities transactions are beyond the scope of N.C.G.S. § 75-1.1." *Id.* at 275, 333 S.E.2d at 241. *Skinner* relies on *Lindner v. Durham Hosiery Mills, Inc.*, 761 F.2d 162 (4th Cir. 1985). In *Lindner* the Fourth Circuit Court of Appeals concluded that the Act did not apply to securities transactions, in part because no court had interpreted the Federal Trade Commission Act, 15 U.S.C.A. § 45(a)(1), upon which N.C.G.S. § 75-1.1 was modeled, to apply to securities transactions. *Cf. Stephenson v. Paine Webber Jackson & Curtis, Inc.*, 839 F.2d 1095 (5th Cir. 1988) (construing similar provisions in Louisiana's statute as not providing coverage to securities transactions); *Spinner Corp. v. Princeville Development Corp.*, 849 F.2d 288 (9th Cir. 1988) (same result in construing similar provisions in Hawaii's statute).

*Skinner* and *Lindner* gave another reason for not applying the Act to securities transactions. This was that to extend the Act to securities transactions would create overlapping supervision, enforcement, and liability in this area, which is already pervasively regulated by state and federal statutes and agencies. The courts concluded there is enough legislative apparatus already in place to govern securities transactions without also applying the Act. *Cf. Bache Halsey Stuart, Inc. v. Hunsucker*, 38 N.C. App. 414, 248 S.E.2d 567 (1978), *disc. rev. denied*, 296 N.C. 583, 254 S.E.2d 32 (1979) (holding for similar, though not identical, reasons that commodities transactions are not covered by the Act).

These cases are pertinent because we believe revolving fund certificates are, in essence, corporate securities. Their purpose is to provide and maintain adequate capital for enterprises that issue them. Raeford's bylaws provide that the purpose of issuing the certificates was to "build up . . . capital." This is the same function served by issuing more conventional corporate securities. Our conclusion in *Skinner* that the Act does not apply to corporate securities should also extend to revolving fund certificates unless there is good reason to treat the certificates differently.

HAJMM CO. v. HOUSE OF RAEFORD FARMS

[328 N.C. 578 (1991)]

There is one important difference that bears consideration between this revolving fund certificate and more conventional corporate securities. According to the evidence, revolving fund certificates are not subject to the same extensive statutory provisions and administrative regulation that govern more conventional corporate securities. Federal involvement with a cooperative's issuance of revolving fund certificates is only incidental to the United States Department of Agriculture's other work. The USDA involvement is largely advisory rather than mandatory.

But pervasive regulation by other sources is not the only basis for refusing to apply the Act to securities transactions. Another reason is that the legislature simply did not intend for the trade, issuance and redemption of corporate securities or similar financial instruments to be transactions "in or affecting commerce" as those terms are used in N.C.G.S. § 75-1.1(a). Subsection (b) of this section of the Act defines the term "commerce" to mean "business activities." "Business activities" is a term which connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized.

Issuance and redemption of securities are not in this sense business activities. The issuance of securities is an extraordinary event done for the purpose of raising capital in order that the enterprise can either be organized for the purpose of conducting its business activities or, if already a going concern, to enable it to continue its business activities. Subsequent transfer of securities merely works a change in ownership of the security itself. Again, this is not a business activity of the issuing enterprise. Similarly, retirement of the security by the issuing enterprise simply removes the security from the capital structure. Like issuance and transfer of the security, retirement is not a business activity which the issuing enterprise was organized to conduct.

Securities transactions are related to the creation, transfer, or retirement of capital. Unlike regular purchase and sale of goods, or whatever else the enterprise was organized to do, they are not "business activities" as that term is used in the Act. They are not, therefore, "in or affecting commerce," even under a reasonably broad interpretation of the legislative intent underlying these terms.

## HAJMM CO. v. HOUSE OF RAEFORD FARMS

[328 N.C. 578 (1991)]

Revolving fund certificates are a cooperative's functional equivalent of traditional corporate securities. They are capital-raising devices. We conclude, therefore, that, like more conventional securities, issuance or redemption of revolving fund certificates are not "in or affecting commerce" and are not subject to the Act.

We reverse the Court of Appeals decision on this issue and reinstate the order of dismissal entered by the trial court.

### IV.

In sum, we affirm, for different reasons, the result reached by the Court of Appeals in concluding there was no error in the trial. We reverse the Court of Appeals' reversal and vacation of the trial court's dismissal of plaintiff's unfair practices claim.

Modified and affirmed in part; reversed in part.

Justice MARTIN dissenting in part.

I respectfully dissent from the majority opinion on the issue of unfair commercial practices. I conclude that plaintiff has made out a claim sufficient to survive defendants' motion under Rule 12(b)(6).

As the majority points out, N.C.G.S. § 75-1.1 protects businesses as well as consumers. This Court has recognized that "unfair trade practices involving only businesses affect the consumer as well." *United Laboratories, Inc. v. Kuykendall*, 322 N.C. 643, 665, 370 S.E.2d 375, 389 (1988); *see also Manufacturing Co. v. Manufacturing Co.*, 38 N.C. App. 393, 396, 248 S.E.2d 739, 742 (1978), *disc. rev. denied and cert. denied*, 296 N.C. 411, 251 S.E.2d 469 (1979) ("G.S. 75-1.1(b) speaks in terms of declaring and providing civil means of maintaining ethical standards of dealings 'between persons engaged in business,' as well as between such persons and the consuming public").

As stated by the majority, it is the law of the case on this appeal that the certificate at issue represented an equity interest in Raeford and created a fiduciary relationship between the parties. It has been further established that defendants breached that fiduciary relationship when they did not act in an "open, fair and honest" manner when they refused to redeem plaintiff's certificate. There is no dispute that Raeford had the financial resources to easily redeem the certificate. The company "loaned" more than

a million dollars to Johnson, acquired an $800,000 airplane, and had a net income of $6.1 million in fiscal year 1986. Defendants do not attempt to refute the evidence of Raeford's ability to redeem the certificate.

The majority relies heavily upon cases involving securities transactions. However, these cases are inapposite, because they were decided upon the theory that securities transactions were *already* subject to extensive regulation under state and federal law, and the application of N.C.G.S. § 75-1.1 would subject such transactions to overlapping supervision and enforcement. *See, e.g., Skinner v. E.F. Hutton & Co.*, 314 N.C. 267, 333 S.E.2d 236 (1985) (citing *Lindner v. Durham Hosiery Mills, Inc.*, 761 F.2d 162 (4th Cir. 1985)). The certificate at issue is only subject to "incidental" federal involvement of an advisory nature. Therefore, I am unable to conclude that the revolving fund securities in the instant case are essentially corporate securities.

The majority cites no authority, and our statute and cases provide none, to support its argument that "commerce" means only the "regular, day-to-day activities or affairs" of a business. The plain words of the statute state otherwise. The majority makes the startling argument that issuance of the certificates (which the majority now calls "securities") is for the purpose of raising capital to conduct its business activities and that this is not a "business activity" within the meaning of the statute. How can raising funds to operate a business not be a business activity?

Further, the majority argues that the repayment of debt incurred to operate Raeford was not a business activity. Certainly defendants did not treat their obligation arising on the certificates in a fair and honest businesslike manner. Finally, the majority returns to its argument that the certificates are really corporate securities after all. This entire analysis rings hollow.

The acquisition of capital in one form or another is the lifeblood today for business. By holding that the issuance and redemption of certificates, as in this case, are not within the protection of Chapter 75-1.1, the majority loses touch with the reality of the business world. Limiting the meaning of "business activities" to the day-to-day affairs of the business eliminates most of the raising of business capital from the protection of the statute. The most important area of business life is no longer subject to the Act,

**HAJMM CO. v. HOUSE OF RAEFORD FARMS**

[328 N.C. 578 (1991)]

but the sales of a baker, for example, remain. Surely this could not have been the intent of the legislature.

I disagree with the majority's conclusion that the legislature intended to include only day-to-day activities in its definition of "commerce" as "business activities." N.C.G.S. § 75-1.1(b) (1988). The statute in plain words says that "commerce" includes "all business activities." *Id.* No matter how one twists it, the issuance of the certificate and defendant's refusal to redeem it were business activities within the meaning of the Act.

Plaintiff has alleged that Nash Johnson, a principal of defendant, stated several times that defendant would never redeem plaintiff's revolving fund certificate; that defendant had failed to redeem plaintiff's certificate after demand; that defendant has sufficient unencumbered funds to redeem the certificate; and that defendant has redeemed the certificate of Nash Johnson in a greater amount than plaintiff's certificate. These allegations, together with the other allegations in plaintiff's complaint, are sufficient to state a cause of action under the statute based upon unfair and deceptive acts.

"Unfair" is a broader term than "deceptive." *Jennings Glass Co. v. Brummer*, 88 N.C. App. 44, 362 S.E.2d 578 (1987), *disc. rev. denied*, 321 N.C. 473, 364 S.E.2d 921 (1988). A practice is unfair when it offends public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious. *Marshall v. Miller*, 302 N.C. 539, 276 S.E.2d 397 (1981). An inequitable assertion of power or position may be an unfair act. *Libby Hill Seafood Restaurants, Inc. v. Owens*, 62 N.C. App. 695, 303 S.E.2d 565, *disc. rev. denied*, 309 N.C. 321, 307 S.E.2d 164 (1983).

Surely, it is unfair to redeem a principal's certificate and to refuse to redeem plaintiff's when defendant has ample cash resources to do so. This is especially true when the principal whose certificate was redeemed has publicly vowed never to redeem plaintiff's certificate unless he is forced to do so. Defendant's conduct toward plaintiff by refusing to refund plaintiff's certificate was immoral, unethical, oppressive, unscrupulous, substantially injurious, and arose out of a position of power defendant had over plaintiff with respect to the certificate.

Plaintiff's pleadings on the claim pursuant to N.C.G.S. § 75-1.1 are sufficient to withstand defendant's motion to dismiss. Except as above stated, I concur in the remainder of the majority opinion.