IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-10

No. 337A20

Filed 11 February 2022

LORETTA NOBEL

v.

FOXMOOR GROUP, LLC, MARK GRIFFIS, and DAVE ROBERTSON

Appeal pursuant to N.C.G.S. § 7A–30(2) from the decision of a divided panel of the Court of Appeals, 272 N.C. App. 300, 846 S.E.2d 761 (2020), affirming in part and reversing in part a judgment entered 30 November 2018 by Judge Charles H. Henry in Superior Court, New Hanover County. Heard in the Supreme Court 4 October 2021.

*Amanda B. Mason and Sarah C. Thomas for plaintiff-appellant.*

*James E. Lea, III, for defendant-appellee.*

BERGER, Justice.

¶ 1        On November 30, 2018, the trial court, sitting without a jury, determined that defendant had violated the North Carolina Unfair or Deceptive Trade Practices Act (the Act). On July 7, 2020, a divided panel of the Court of Appeals reversed the trial court's decision as to plaintiff's claims under the Act. *Nobel v. Foxmoor Grp., LLC,* 272 N.C. App. 300, 846 S.E.2d 761, *review denied in part,* 375 N.C. 495, 847 S.E.2d

884 (2020).[1]  Plaintiff appeals to this Court pursuant to N.C.G.S. § 7A-30(2), arguing that the Court of Appeals erroneously concluded plaintiff's claims were beyond the scope of the Act.  Upon review, we affirm the decision of the Court of Appeals.

## I.  Factual and Procedural Background

In November 2010, Dave Robertson (defendant)[2] and Mark Griffis formed Foxmoor Group, LLC (Foxmoor).  The business was intended to operate as a trucking company, and Foxmoor's annual report filed with the Secretary of State listed the nature of the business as "agricultural and transportation."  Griffis and defendant were the sole members and managers of Foxmoor.

In an effort to raise capital for the newly formed company, Griffis and defendant reached out to plaintiff and encouraged her to invest in Foxmoor.  Plaintiff was a personal friend of Griffis and defendant.  The three interacted in various social and professional settings, and Griffis and defendant assisted plaintiff financially at one point.  On December 12, 2011, plaintiff emailed Griffis to further inquire about "how an investment [in Foxmoor] might work."  Griffis subsequently notified plaintiff of an opportunity to invest either $75,000 or $150,000 in the company.   Plaintiff

---

[1] Defendant Robertson petitioned this Court for discretionary review pursuant to N.C.G.S. § 7A–31.  Defendant's petition was denied, and the only issue before this Court is plaintiff's appeal based upon a dissent at the Court of Appeals.

[2] Only defendant filed a timely notice of appeal from the trial court to the Court of Appeals.  As to the other two original defendants, Griffis and Foxmoor Group, LLC, their appeals were dismissed by order of the Court of Appeals on January 31, 2020.  Accordingly, the claims against defendant Robertson are the only claims on appeal before this Court.

informed Griffis and defendant that she was only able to invest $25,000 at that time. The parties agreed, and plaintiff sent a personal check addressed to "Foxmoor Transport" on January 9, 2012. Although there is no evidence that a promissory note was executed by the parties at that time, the check from plaintiff to Foxmoor had the word "loan" written in the memo line. Plaintiff received payments of $3,510 in March, April, and May 2012, towards satisfaction of the $25,000 loan.

¶ 4 Griffis and defendant met with plaintiff throughout April and May 2012, and they informed plaintiff that the company had been performing well. Griffis and defendant offered plaintiff an opportunity to make an additional $75,000 investment in Foxmoor. On May 24, 2012, plaintiff agreed to provide an additional $75,000 investment in Foxmoor. Plaintiff again sent a personal check made out to "Foxmoor Group, LLC" with "investment" written in the memo line.

¶ 5 Also on May 24, 2012, Griffis executed a promissory note evidencing indebtedness to plaintiff for "the principal sum of $75,000, together with interest of $93,000." The promissory note required Foxmoor to make monthly payments to plaintiff to satisfy the debt beginning on July 1, 2012. Additionally, and in light of their personal friendship, Griffis included an attachment to the promissory note extending health insurance to plaintiff for four years. That same day, plaintiff's $75,000 check was deposited into Foxmoor's account.

¶ 6 In June 2012, plaintiff received a check from Foxmoor in the amount of $7,000.

Defendant advised plaintiff that half of the $7,000 amount constituted the first payment on the $75,000 loan, with the remainder being an installment of the initial $25,000 loan. Plaintiff did not receive any additional payments from defendant, Griffis, or Foxmoor, and she was not provided health insurance. When plaintiff inquired into the status of the missed payments, Griffis and defendant informed plaintiff that any further attempt to receive repayment would result in the company filing for bankruptcy. Foxmoor was administratively dissolved by the Secretary of State on March 4, 2014.

¶ 7 In December 2015, plaintiff filed the present action, alleging, *inter alia*, that defendant, Griffis, and Foxmoor, "by their conduct, acting individually and corporately, engaged in unfair and deceptive trade practices in and affecting commerce, all in violation of N.C.G.S. § 75-1, *et. seq.*" Following a bench trial, the trial court determined that defendant, Griffis, and Foxmoor had violated the Act and awarded treble damages in the amount of $493,500.

¶ 8 Defendant timely appealed from the trial court's judgment to the Court of Appeals. The majority of a divided panel of the Court of Appeals reversed the portion of the trial court's judgment that allowed for plaintiff to recover under the Act. *Nobel*, 272 N.C. App. 300, 310, 846 S.E.2d 761, 768. The Court of Appeals majority reasoned that the conduct at issue related to an investment for the purpose of funding Foxmoor and therefore was not "in or affecting commerce." *Id.* Based on a dissenting opinion,

plaintiff appealed to this Court, arguing that the majority opinion of the Court of Appeals erred in holding that plaintiff's claim fell outside of the purview of the Act. We disagree.

## II.  Analysis

Whether an act found to have occurred is an unfair or deceptive practice which violates N.C.G.S. § 75–1.1 is a question of law for the court.  *Hardy v. Toler*, 288 N.C. 303, 308–09, 218 S.E.2d 342, 345–46 (1975).

> Ordinarily it would be for the jury to determine the facts, and based on the jury's finding, the court would then determine as a matter of law whether the defendant engaged in unfair or deceptive acts or practices in the conduct of trade or commerce.  Therefore, it does not invade the province of the jury for this Court to determine as a matter of law on appeal that acts expressly found by the jury to have occurred and to have proximately caused damages are unfair or deceptive acts in or affecting commerce under N.C.G.S. § 75–1.1.

*Ellis v. N. Star Co.*, 326 N.C. 219, 226, 388 S.E.2d 127, 131 (1990) (cleaned up).

Pursuant to N.C.G.S. § 75-1.1(a), "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."  N.C.G.S. § 75-1.1 (2019).  This Court has stated that the purpose of North Carolina's Unfair and Deceptive Trade Practices Act is to provide

> civil legal means to maintain [ ] ethical standards of dealings between persons engaged in business, and between persons engaged in business and the consuming public within this State, to the end that good faith and fair dealings between buyers and sellers at all levels of

commerce be had in this State.

*Bhatti v. Buckland*, 328 N.C. 240, 245, 400 S.E.2d 440, 443 (1991) (cleaned up).

¶ 11    To recover under the Act, a plaintiff must establish that: "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp,* 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). " 'Commerce' includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession." N.C. Gen. Stat. 75-1.1(b). This Court has explained that the term " '[b]usiness activities' . . . connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized." *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 594, 403 S.E.2d 483, 493 (1991). "Although th[e] statutory definition of commerce is expansive, the [Act] is not intended to apply to all wrongs in a business setting." *Id.* at 593, 403 S.E.2d at 492.

¶ 12    In *HAJMM*, this Court held that the plaintiff there could not recover under the Act because the issuance of corporate securities to raise capital was not a business activity "in or affecting commerce." *Id.* at 594–95, 403 S.E.2d at 493. There, the conduct complained of involved the issuance of revolving fund certificates. *Id.* This Court held that "the legislature simply did not intend for the trade, issuance and

redemption of corporate securities or similar financial instruments to be transactions 'in or affecting commerce' as those terms are used in N.C.G.S. § 75-1.1(a)[.]" *Id.* In so concluding, this Court noted that utilization of financial mechanisms for capitalization merely enable an entity to organize or continue ongoing business activities in which it is regularly engaged and cannot give rise to a claim under the Act. *Id.* Thus, actions solely connected to a company's capital fundraising are not " 'in or affecting commerce,' even under a reasonably broad interpretation of the legislative intent underlying these terms." *Id.*

¶ 13        Plaintiff attempts to distinguish *HAJMM*, arguing that the type of security used to raise capital in *HAJMM* is different than the promissory note at issue here. However, this argument overlooks the purpose for which both the security in *HAJMM* and the promissory note here were issued. In this case, as in *HAJMM*, defendant's dealings with plaintiff did not involve the normal business activity of the purported company. Instead, the transactions in both instances involved investments "to provide and maintain adequate capital for [the] enterprise." *Id.* at 593, 403 S.E.2d at 493.

¶ 14        Investments and other mechanisms associated with financing business entities are "unlike [the] regular purchase and sale of goods, or whatever else [an] enterprise was organized to do" and "are not 'business activities' as that term is used in the Act." *Id.* at 594, 403 S.E.2d at 493. Instead, investments are "extraordinary

events done for the purpose of raising capital" for a business entity to continue its business purpose and day-to-day activities. *Id.* To be sure, the nature of the personal relationship between the parties and defendant's use of that relationship to advance his own personal gain certainly suggests bad faith on the part of defendant; however, "the [Act] is not intended to apply to all wrongs in a business setting." *Id.* at 593, 403 S.E.2d at 492. As in *HAJMM*, the underlying activity at issue here concerns a business entity's acquisition of capital. Thus, while defendant's conduct in securing the loans from plaintiff may be morally suspect, it was not "in or affecting commerce" because plaintiff's investment did not constitute a "business activity" as defined by this Court.

¶ 15    Moreover, this Court has clarified that the Act concerns two types of business transactions: "(1) interactions between businesses, and (2) interactions between businesses and consumers." *White v. Thompson*, 364 N.C. 47, 52, 691 S.E.2d 676, 679 (2010). The internal operations of a business entity are not within the purview of the Act. *Id.* at 53, 691 S.E.2d at 680 ("[T]he Act is not focused on the internal conduct of the individuals within a single market participant, that is, within a single business.") Instead, the Act's provisions seek to regulate interactions between businesses and those involving businesses and consumers. Thus, if an alleged unfair or deceptive action remains confined within a single business, the Act is inapplicable. *See Dalton*, 353 N.C. at 658, 548 S.E.2d at 712 (noting the "longstanding presumption against

unfair and deceptive practices claims as between employers and employees"); *see also Sara Lee Corp. v. Carter*, 351 N.C. 27, 519 S.E.2d 308 (1999) (concluding that the unfair conduct of the defendant-employee was within the Act's coverage because it occurred outside of the employer-employee relationship).

¶ 16    In the case before us, plaintiff does not fall under either category of market participants for which the Act protects. While a personal relationship existed between plaintiff and defendant, there is no evidence that plaintiff was a consumer of Foxmoor, nor engaged in any commercial transaction with the company. *See Marshall v. Miller*, 302 N.C. 539, 543, 276 S.E.2d 397, 400 (1981) (concluding that the purpose of the Act is "to establish an effective private cause of action for aggrieved consumers in this State."). Instead, plaintiff's involvement with the company, albeit initially through her friendship with defendant, was limited to the loans she provided for the purpose of capitalization. Thus, plaintiff was an investor in Foxmoor. The investments provided by plaintiff, and any related exchanges, concern the internal operations of Foxmoor, and plaintiff's claim is based solely on the interaction between her, as an investor, and the company's member manager. This interaction occurred entirely within a single market participant, i.e., within a single business, thus taking it outside the ambit of the Act.

¶ 17    Because the loan at issue here was a capital raising device, it was not "in or affecting commerce" for purposes of the Act. Moreover, the conduct occurred solely

NOBEL v. FOXMOOR GROUP, LLC

2022-NCSC-10

*Opinion of the Court*

within a single market participant, and plaintiff, as an investor, is not a market participant protected under the Act. Accordingly, the Court of Appeals did not err in reversing the trial court with respect to plaintiff's unfair and deceptive trade practices claim.

AFFIRMED.

Justice EARLS dissenting.

The majority holds that when the co-founder and manager of a limited liability company repeatedly defrauds an acquaintance in an effort to convince her to invest money in the business, and then misappropriates the company's funds for his own personal use, those actions are not "unfair or deceptive acts or practices in or affecting commerce." N.C.G.S. § 75-1.1(a) (2021). To reach this conclusion, the majority adopts the curious and counterintuitive position that these actions are not "business activities" or conduct "in or affecting commerce" because they involve "[i]nvestments and other mechanisms associated with financing business entities." This premise is untethered from the UDTPA's text and is inconsistent with the General Assembly's obvious intent to protect the public from unscrupulous dealings in business interactions, which it attempted to achieve by enacting a broad "remedial statute[ ]." *Taylor v. Volvo N. Am. Corp.*, 339 N.C. 238, 258 (1994). Accordingly, I respectfully dissent.

In this case, plaintiff Loretta Nobel sued defendant Dave Robertson, the co-founder and co-manager of Foxmoor Group LLC (Foxmoor), a company purportedly involved in the trucking industry. Nobel alleged that Robertson repeatedly deceived her regarding the activities and health of Foxmoor, misled her about the terms of investments she was considering making in the company, and lied to her in promising that Foxmoor would provide her with health insurance and a regular stream of interest-bearing repayments in exchange for her investment. Robertson did all this

in an effort to convince Nobel to give him more money, supposedly to fund Foxmoor.

Nobel was not a sophisticated institutional investor. She was a retiree facing "financial difficulties" who had been living in Ecuador and knew Robertson and Foxmoor's other co-founder socially. When she agreed to invest in Foxmoor, she alleges she tapped into her retirement savings account and handed over her personal credit card information. Robertson and his co-founder used portions of the funds obtained from Nobel to purchase cruise tickets, pay for cosmetic surgery, and book a stay at a luxury hotel. When Nobel expressed concern that she had not been repaid as promised, Robertson threatened bankruptcy.

North Carolina's Unfair and Deceptive Trade Practices Act (UDTPA) prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C.G.S. § 75-1.1(a) (2021). For the purposes of the UDTPA, the General Assembly defined "commerce" to include "all business activities, however denominated, [except] professional services rendered by a member of a learned profession." N.C.G.S. § 75-1.1(b). The UDTPA contains only one other enumerated exception, a provision excluding certain acts undertaken "in the publication or dissemination of an advertisement." N.C.G.S. § 75-1.1(c). Neither of these exceptions applies here.

Like all remedial statutes, the UDTPA is to "be construed liberally to accomplish the purpose of the Legislature and to bring within it all cases fairly falling

within its intended scope." *Hicks v. Albertson*, 284 N.C. 236, 239 (1973). One purpose of the UDTPA, a purpose also underlying the provision allowing successful plaintiffs treble damages, is to "encourage private enforcement of violations of [the UDTPA] and to encourage settlements." *Taylor*, 339 N.C. at 257–58.

¶ 23        On its face, nothing in the UDTPA gives any reason to think that when a corporate manager acting in his capacity as a manager interacts with an independent member of the public in an effort to obtain financing to operate that company, the manager's conduct is not "in or affecting commerce." The UDTPA applies to "*all* business activities," with two statutorily defined exceptions not relevant here. N.C.G.S. § 75-1.1(b) (emphasis added). Words included in a statute are "presumed . . . to convey their natural and ordinary meaning." *In re McLean Trucking Co.*, 281 N.C. 242, 252 (1972). Surely, the "natural and ordinary meaning" of the phrase "business activit[ies]" and "in and affecting commerce" encompasses efforts to obtain the funds needed to sell goods or services for profit. Dictionaries only confirm the obvious. *See, e.g.*, Activity, Black's Law Dictionary (11th ed. 2019) (defining "commercial activity" as "[a]n activity, such as operating a business, conducted to make a profit"). So does reality: undergraduate and post-graduate business schools routinely teach courses and offer concentrations in subjects like corporate finance because it is a

business activity.[1]

¶ 24     The structure of the UDTPA further confirms the General Assembly's intent to sweep broadly. As previously described, the UDTPA contains two enumerated carve-outs. Typically, when the General Assembly sees fit to include specific exceptions in a statute, we presume the General Assembly did not intend to create other, unenumerated exceptions. *See, e.g.*, *Evans v. Diaz*, 333 N.C. 774, 779–80 (1993) ("Under the doctrine of *expressio unius est exclusio alterius*, when a statute lists the situations to which it applies, it implies the exclusion of situations not contained in the list."). There is no reason to think the General Assembly meant otherwise in choosing what activities to exempt from the purview of the UDTPA.

¶ 25     Admittedly, this Court departed somewhat from the plain text of the UDTPA in *HAJMM*, where we held that the "[i]ssuance and redemption of securities are not . . . business activities" within the meaning of the UDTPA because they are "done for the purpose of raising capital in order that the enterprise can either be organized for

---

[1] *See, e.g.*, University of North Carolina Kenan-Flagler Business School, *MBA Corporate Finance Concentration*, https://www.kenan-flagler.unc.edu/programs/mba/full-time-mba/academics/concentrations-electives/corporate-finance/; North Carolina State University, *Business Administration (BS): Finance Concentration*, http://catalog.ncsu.edu/undergraduate/management/business/business-administration-bs-finance-concentration/; Duke University Fuqua School of Business, *MBA Program* (describing concentrations in corporate finance and investments) https://areas.fuqua.duke.edu/finance/academic-programs/mba-program/; North Carolina Central University, *Business Administration, Financial Analytics Concentration, BBA*, https://www.nccu.edu/academics/undergraduate-programs/business-administration-financial-concentration-bba.

the purpose of conducting its business activities or, if already a going concern, to enable it to continue its business activities." *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 594 (1991). We explained that the phrase "business activities" was "a term which connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized." *Id.* As then-Justice Martin noted in a vigorous dissent, the majority

> cites no authority, and our statute and cases provide none, to support its argument that "commerce" means only the "regular, day-to-day activities or affairs" of a business. The plain words of the statute state otherwise. . . . How can raising funds to operate a business not be a business activity?
>
> . . . .
>
> The acquisition of capital in one form or another is the lifeblood today for business. . . . [In its holding] the majority loses touch with the reality of the business world. Limiting the meaning of "business activities" to the day-to-day affairs of the business eliminates most of the raising of business capital from the protection of the statute. The most important area of business life is no longer subject to the Act . . . . Surely this could not have been the intent of the legislature.
>
> . . . .
>
> The statute in plain words says that "commerce" includes "all business activities." *Id.* No matter how one twists it, the issuance of the certificate and defendant's refusal to redeem it were business activities within the meaning of the Act.

*Id.* at 596–97 (1991) (Martin, J., dissenting in part). Nevertheless, Nobel does not ask us to reconsider *HAJMM*, and the majority is correct that it remains good law.

Still, the majority errs in choosing to expand the holding of *HAJMM* beyond the circumstances addressed in that case, in contravention of the UDTPA's text, structure, and animating purpose. *HAJMM* involved a stock certificate issued to a limited partnership, not a promissory note offered to a non-professional individual investor. *HAJMM*, 328 N.C. at 580. This is a salient distinction. One of the primary justifications for the rule announced in *HAJMM* was the Court's belief that the General Assembly did not intend to "create overlapping supervision, enforcement, and liability in this area, which is already pervasively regulated by state and federal statutes and agencies." *Id.* at 593. Yet it is unclear whether this transaction is subject to the North Carolina Securities Act. While the existence of these regulations was "not the only basis" for the decision in *HAJMM*, *id.* at 594, the potential absence of regulatory oversight in this case risks undermining the "overall purpose" of the UDTPA which was to "supplement federal legislation, so that local business interests could not proceed with impunity." *Marshall v. Miller*, 302 N.C. 539, 549 (1981).

Further, the line between a company's "business purpose and day-to-day activities" and a company's efforts relating to the "acquisition of capital" is not as clear on the facts of this case as the majority suggests. Besides stray references to "trucking" and "transportation" contained in documents Foxmoor filed with the State,

it is unclear if Foxmoor ever endeavored to provide any kind of good or service to the public in an effort to earn a profit. Put another way, there is no evidence Foxmoor had any "business purpose" or "day-to-day activities" other than the "acquisition of capital" from people like Nobel.[2] To the extent Foxmoor did sell a product or service to the public, it appears to have been the (ultimately illusory) opportunity to own an income-generating asset. Robertson's conduct in selling that product to Nobel should not be immunized by his self-serving (and seemingly false) description of the nature of his business.

I also disagree with the majority's reliance on *White v. Thompson*, 364 N.C. 47 (2010), another case in which this Court discerned an exception to the UDTPA not immediately apparent on the face of the act. Even if *White* means that the UDTPA does not apply to actions that "remain[ ] confined within a single business," it is difficult to discern how a company receiving funding from an entirely unaffiliated investor is an "interaction occurr[ing] entirely within a single market participant." As Judge Arrowood correctly explained in his dissent below, Noble "is neither a

---

[2] This ambiguity is not limited to companies as haphazardly operated as Foxmoor. Some companies that sell goods or services interact with consumers in ways that could fairly be characterized as both a "day-to-day activity" and an effort to "acqui[re] . . . capital"—for example, when a company accepts payment for goods or services in the form of an alternative currency it then holds as an asset on its balance sheet in the hopes that the value of the currency appreciates. *See, e.g.*, Anne Sraders, *Corporate crypto 101: How companies are using Bitcoin and other digital currency*, Fortune Magazine (29 July 2021), https://fortune.com/2021/07/29/companies-using-bitcoin-btc-crypto-101/.

partner nor has any ownership stake in [Foxmoor]. Instead, [she] acted as an outside

investor, and is therefore better viewed as a separate market participant." *Nobel*, 272

N.C. App. at 312. Prior to giving money to Foxmoor, Nobel had absolutely no

connection to the company. She was not an owner, director, manager, or employee.[3]

Further, at least some of the conduct she asserts violated the UDTPA occurred *before*

she executed the promissory note—it was that conduct which induced her to invest.

Thus, applying the UDTPA under these circumstances would in no way "intrude into

the internal operations of a single market participant." *White*, 364 N.C. at 53.

¶ 29        In interpreting and applying *HAJMM* and *White*'s interpretation of the

UDTPA, we should do our best to respect the General Assembly's decision to enact a

broad remedial statute designed to protect the general public. The fact that a statute

is broadly written is never itself justification for curtailing its sweep. *See, e.g.*, *Little*

*Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381

(2020) ("It is a fundamental principle of statutory interpretation that absent

provisions cannot be supplied by the courts. . . . This principle applies not only to

adding terms not found in the statute, but also to imposing limits . . . that are not

supported by the text.") (cleaned up). Here, the defendant's conduct is clearly

encompassed within the plain language of the UDTPA, even as that language has

---

[3] By contrast, if Robertson had been sued by his co-founder, who was also Foxmoor's co-manager, the exception recognized in *White* would obviously apply.

been construed in our precedents. Accordingly, I respectfully dissent.

Justice HUDSON joins in this dissenting opinion.