Urquhart v. Trenkelbach, 2017 NCBC 11.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 3055

CHRISTOPHER J. URQUHART and
INTERCON SUCCESSION, INC.,

      Plaintiffs and
      Counterclaim
      Defendants,

      v.

CURTIS L. TRENKELBACH,
individually; INTERCON BUILDING
COMPANY, LLC; and INTERCON
BUILDING CORPORATION OF
NORTH CAROLINA,

      Defendants and
      Counterclaim Plaintiffs.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER & OPINION ON DEFENDANTS'
MOTION TO DISMISS PURSUANT TO
RULE 12(b)(6)**

1. THIS MATTER is before the Court on Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) ("Motion"). After considering the Motion, the briefs, and the arguments of counsel, the Court GRANTS IN PART AND DENIES IN PART the Motion.

    *Hamilton Stephens Steele & Martin, PLLC, by Adam L. Horner and Laura G. Barringer, for Plaintiffs.*

    *Johnston Allison & Hord, P.A., by Patrick E. Kelly and Michael J. Hoefling, for Defendants.*

Gale, Chief Judge.

## I.     FACTUAL BACKGROUND

2.     The Court does not make findings of fact on a motion to dismiss, but recites only the facts that are relevant to the Court's determination of the Motion. Those facts are accepted as true solely for purposes of the Motion, and all reasonable inferences are construed in Plaintiffs' favor.

3.     On January 15, 2007, Plaintiff Christopher J. Urquhart ("Urquhart") began working for Defendant InterCon Building Corporation of North Carolina ("IBC"), a construction company that builds commercial buildings. (Am. Compl. ¶ 14.) Defendant Curtis L. Trenkelbach ("Trenkelbach") is IBC's sole owner and shareholder. (Am. Compl. ¶ 13.) Urquhart and Trenkelbach entered into an oral agreement that Urquhart would gradually buy out Trenkelbach's ownership in IBC (the "Succession Plan").[1] (Pls.' Resp. Br. Opp'n to Defs.' Mot. Dismiss Pls.' Third, Sixth, and Seventh through Thirteenth Claims 1.)

4.     Urquhart and Trenkelbach formed Defendant InterCon Building Company, LLC ("InterCon"), a North Carolina limited liability company, to facilitate carrying out the Succession Plan. (Am. Compl. ¶ 16.) Urquhart also formed Plaintiff InterCon Succession, Inc. ("IS"), a North Carolina corporation for which Urquhart is the sole owner and shareholder. (Am. Compl. ¶¶ 17–18.)

---

[1] Paragraph 15 of the Amended Complaint refers to the Succession Plan as an agreement that Urquhart would gradually buy out Trenkelbach's ownership interest in InterCon. (*See* Am. Compl. ¶ 15.) However, the Memorandum of Agreement and other documents refer to the Succession Plan as an agreement regarding ownership in IBC. (*See* Defs.' Mot. Dismiss, Answer, Affirmative Defenses, Countercls., and Third-Party Compl. Ex. B ("Mem. Agreement"), at 1.) The agreement was that Urquhart's or IS's interest in InterCon would increase as IBC's interest in InterCon decreased.

5. On January 1, 2010, Urquhart, Trenkelbach, IBC, and InterCon executed InterCon's Operating Agreement, as well as a Memorandum of Agreement that summarizes the Succession Plan. (Am. Compl. ¶ 19.) Urquhart and Trenkelbach each executed an employment agreement with InterCon. (Am. Compl. ¶ 19.) Subsequent references to the Employment Agreement in this Order & Opinion refer to Urquhart's Employment Agreement.

6. The Operating Agreement identifies IBC, Urquhart (or Urquhart's Corporation),[2] and Trenkelbach as InterCon's three members, each of which was required to make an initial capital contribution. (Defs.' Mot. Dismiss, Answer, Affirmative Defenses, Countercls., and Third-Party Compl. Ex. C ("Operating Agreement") § 5.1; Operating Agreement App. A ¶ 15.)

7. Urquhart and Trenkelbach were both InterCon employees and member–managers. (Operating Agreement § 6.5; *see also* Am. Compl. ¶ 23.) Trenkelbach, through IBC, has ultimate control of InterCon in that he decides "any dispute between the parties over a company matter." (Am. Compl. ¶ 29; *see* Operating Agreement § 6.3(c).)

---

[2] Urquhart's corporation, IS, was not a member of InterCon at the time the Operating Agreement was executed. However, the parties anticipated that Urquhart would assign his membership interest to IS. Therefore, each time the Operating Agreement refers to Urquhart as a member, it states "Urquhart (or Urquhart's Corporation)." (*See* Operating Agreement App. A ¶ 15; *see, e.g.*, Operating Agreement §§ 7.1, 13.1–.3.) While there is nothing in the record that indicates if or when Urquhart assigned his ownership interest to IS, the Court assumes for purposes of this Motion that Urquhart did transfer his ownership interest to IS, that Defendants do not contend that this transfer triggered any obligation for Urquhart to sell his interest in InterCon to IBC, and that Urquhart remained a member of InterCon at all times during his employment with InterCon.

8.     Section 6.6 of the Operating Agreement provides that Trenkelbach and Urquhart can be removed from InterCon only "for cause," which is defined to include six specific acts, including termination of employment.   (Operating Agreement § 6.6(a)(vi); *see also* Am. Compl. ¶ 25(f).)

9.     The Operating Agreement also provides that IBC has an option to purchase Urquhart's or IS's ownership interest in InterCon upon the occurrence of any of three triggering events: (1) Urquhart is terminated for cause, as defined by his Employment Agreement, (2) Urquhart is terminated for any reason other than for cause (except death), or (3) Urquhart or IS transfers or attempts to transfer any portion of their membership interest.   (Operating Agreement § 13.1(a)–(c).)   The purchase price varies depending on whether Urquhart's termination is for cause or without cause.   (*See* Operating Agreement § 13.3(a)–(b).)

10.     Urquhart's Employment Agreement specifies that his employment with InterCon will terminate upon his (1) death, (2) resignation, (3) termination due to a disability, or (4) termination for cause.   (Defs.' Mot. Dismiss, Answer, Affirmative Defenses, Countercls., and Third-Party Compl. Ex. A ("Employment Agreement") ¶ 14; *see also* Am. Compl. ¶ 32.)   Urquhart's Employment Agreement lists eleven categories of events which allow him to be terminated for cause, including but not limited to violation of InterCon's policies, rules, and regulations, intentional misconduct in connection with working for InterCon, misconduct outside of work that harms InterCon or its reputation, and removal as a manager under section 6.6 of the

Operating Agreement. (Employment Agreement ¶ 14(b)(vi), (ix)–(x); *see also* Am. Compl. ¶ 33.)

11. The Memorandum of Agreement memorialized the Succession Plan. (Mem. Agreement 1.) InterCon was created and used to facilitate Urquhart's "over-time succession" of Trenkelbach's ownership of IBC by liquidating IBC's ownership interest in InterCon. (Mem. Agreement 1.) The Memorandum of Agreement depicts how, over a nine- to ten-year period, IBC's interest in InterCon would decrease, and correspondingly, Urquhart's or IS's interest in InterCon would increase. (Mem. Agreement 1; *see* Mem. Agreement Ex. A.)

12. From 2010 through 2014, Urquhart continued his employment with InterCon, and continued as a co-manager–member with Trenkelbach. (Am. Compl. ¶ 34.) During that time, InterCon's revenues grew by approximately 400%. (Am. Compl. ¶ 34.)

13. On January 15, 2015, Urquhart was advised by letter that his employment with InterCon was being terminated for cause because of a "loss of trust and confidence and harsh behavior." (Am. Compl. ¶ 48.) Trenkelbach, on behalf of IBC, then attempted to exercise the purchase option, which he contends was triggered by the termination, and offered to calculate and pay the purchase price using the without-cause termination formula if Urquhart would sign a separation agreement. (Am. Compl. ¶¶ 49–51.) Urquhart refused to sign the separation agreement and refused Trenkelbach's tender of that purchase price. Urquhart contends that he was not properly terminated, either for cause or for any reason permitted by the

Operating Agreement or the Employment Agreement, and that as a result, no purchase-option trigger event occurred, and he remains an InterCon member. (Am. Compl. ¶¶ 52, 56–58.) Defendants contend that Urquhart was terminated for cause, is no longer an InterCon member, is obligated to sell his interest at a price determined by the Operating Agreement buy-out formula for a for-cause termination, and has only the rights in InterCon that existed on the date that his employment was terminated.

## II.   PROCEDURAL HISTORY

14.    Plaintiffs filed their original Complaint and a notice of designation on February 13, 2015. The action was designated as a mandatory complex business case on February 16, 2015, and assigned to the undersigned on February 17, 2015.

15.    On February 19, 2015, Urquhart made a written demand to InterCon to take action to address Trenkelbach's alleged wrongs.

16.    On May 29, 2015, Defendants moved to dismiss Plaintiffs' tortious interference with contract claim and unfair or deceptive trade practices claim.

17.    On November 10, 2015, after obtaining leave of court, Plaintiffs filed an Amended Complaint, asserting both individual claims by Urquhart and IS, as well as derivative claims on behalf of InterCon. The various claims are in some instances against only Trenkelbach, individually. The Amended Complaint includes the following claims: (1) Urquhart's claim for breach of contract against Trenkelbach and InterCon; (2) Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing against Trenkelbach and InterCon; (3) Plaintiffs' claim for tortious

interference with contract against Trenkelbach; (4) Plaintiffs' claim for declaratory judgment against InterCon and IBC; (5) Plaintiffs' claim for unjust enrichment against all Defendants; (6) Plaintiffs' claim for unfair or deceptive trade practices against all Defendants; (7) Urquhart's demand for accounting, information, and pro rata recovery as to InterCon (the "accounting claim"); (8) Urquhart's claim against Trenkelbach for constructive fraud, breach of fiduciary duty, breach of the duties of good faith and fair dealing, and breach of loyalty, brought both individually by Urquhart and derivatively on behalf of InterCon; (9) Urquhart's claim for unjust enrichment against Trenkelbach, brought both individually and derivatively; (10) Urquhart's claim for constructive trust against Trenkelbach and IBC, brought both individually and derivatively; (11) Urquhart's claim for conversion against Trenkelbach and IBC, brought both individually and derivatively; (12) Urquhart's claim for embezzlement against Trenkelbach and IBC, brought both individually and derivatively; and (13) Urquhart's claim for punitive damages against Trenkelbach and IBC, brought both individually and derivatively.

18.    On January 11, 2016, Defendants filed the Motion, which addresses four individual claims: (1) Plaintiffs' tortious interference with contract claim, (2) Plaintiffs' unfair or deceptive trade practices claim, (3) Urquhart's accounting claim, and (4) Urquhart's embezzlement claim. The Motion also seeks to dismiss all derivative claims on the grounds that Urquhart is not an InterCon member with standing to bring derivative claims.

19.    On May 11, 2016, Defendants filed their Motion for Discovery Sanctions, which will be addressed by a separate order.

20.    On August 25, 2016, the Court heard argument on both pending motions.  On August 26, 2016, Urquhart voluntarily dismissed the individual and derivative embezzlement claims without prejudice.

21.    The Motion is ripe for determination.

## III.    LEGAL STANDARD

22.    When ruling on a motion to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure, the Court decides "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory."  *Crouse v. Mineo*, 189 N.C. App. 232, 237, 658 S.E.2d 33, 36 (2008) (quoting *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987)).  The Court must treat the factual allegations in the complaint as true, but is not bound by any "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Strickland v. Hedrick*, 194 N.C. App. 1, 20, 669 S.E.2d 61, 73 (2008) (quoting *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005)).  The Court should dismiss the complaint if it determines, based on the face of the complaint, "that no law supports plaintiff's claim," that there are insufficient facts to establish plaintiff's claim, or that "some fact disclosed in the complaint necessarily defeats plaintiff's claim."  *Jackson v. Bumgardner*, 318 N.C.

172, 175, 347 S.E.2d 743, 745 (1986) (citing *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985)).

23.     The Court "may . . . consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant." *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001).   Here, in addition to considering the Amended Complaint, the Court can consider the Operating Agreement, the Memorandum of Agreement, and the Employment Agreement in resolving the Motion.

## IV.    ANALYSIS

### A. Plaintiffs' Unfair or Deceptive Trade Practices Claim Fails Because the Alleged Acts Were Not In or Affecting Commerce.

24.     Plaintiffs contend that Defendants engaged in unfair or deceptive trade practices ("UDTP") by wrongfully terminating Urquhart, diverting InterCon funds for Trenkelbach's personal use, and frustrating Urquhart and Trenkelbach's Succession Plan.  (Am. Compl. ¶ 100(a)–(g).)  To prevail on a UDTP claim, Plaintiffs must establish that "(1) [D]efendant[s] committed an unfair or deceptive act or practice, (2) that the action in question was in or affecting commerce, [and] (3) that said act proximately caused actual injury to plaintiff."  *Canady v. Mann*, 107 N.C. App. 252, 260, 419 S.E.2d 597, 602 (1992).  Defendants contend that Plaintiffs' UDTP claim must fail because the Amended Complaint does not sufficiently allege the first and second elements.

25.     "Plaintiff[s] must first establish that [D]efendants' conduct was 'in or affecting commerce' before the question of unfairness or deception arises."  *HAJMM*

*Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 592, 403 S.E.2d 483, 492 (1991). The Court determines whether the alleged deceptive acts are "in or affecting commerce" as a matter of law. *See Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 71, 653 S.E.2d 393, 399 (2007).

26. For purposes of a UDTP claim, commerce is defined as "all business activities." N.C. Gen. Stat. § 75-1.1(b) (2015). "'Business activities' is a term which connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized." *HAJMM Co.*, 328 N.C. at 594, 403 S.E.2d at 493. "Although this statutory definition of commerce is expansive, [section 75-1.1] is not intended to apply to all wrongs in a business setting." *Id.* at 593, 403 S.E.2d at 492. The analysis used to determine whether alleged acts are "in or affecting commerce" focuses on whether the conduct involves either "(1) interactions between businesses, [or] (2) interactions between businesses and consumers." *White v. Thompson*, 364 N.C. 47, 52, 691 S.E.2d 676, 679 (2010). Acts are not "in or affecting commerce" if they are restricted to internal corporate matters. *See id.*

27. The North Carolina Court of Appeals recently construed the two North Carolina Supreme Court opinions that have addressed whether disputes between an employer and employee may constitute a UDTP claim. *See Alexander v. Alexander*, ___ N.C. App. ___, 792 S.E.2d 901, 904–06 (2016) (discussing *White*, 364 N.C. at 49–54, 691 S.E.2d at 677–80 and *Sara Lee Corp. v. Carter*, 351 N.C. 27, 29, 519 S.E.2d

308, 309 (1999)).  *White v. Thompson* is often cited in cases where the employer claims that an employee's actions are not governed by section 75-1.1 because "unfair or deceptive conduct contained solely within a single business is not covered by [section 75-1.1]."  364 N.C. at 53, 691 S.E.2d at 680.  However, *White* does not draw a bright-line rule that excludes claims from section 75-1.1 solely because they arise from an employer–employee relationship.  *Id.*  As the Court of Appeals noted in *Alexander*, an employee may be liable under section 75-1.1 if the employee's alleged deceptive acts "involve 'outside businesses,' 'distinct corporate entities,' or the interruption of a 'commercial relationship' between two market participants."  *Alexander*, 792 S.E.2d at 906 (discussing *Sara Lee Corp.*, 351 N.C. at 29, 519 S.E.2d at 309 and *Songwooyarn Trading Co. v. Sox Eleven, Inc.*, 213 N.C. App. 49, 714 S.E.2d 162 (2011)).

28.     *Sara Lee Corp. v. Carter* is the leading case recognizing that a UDTP claim can arise from an employment relationship.  351 N.C. at 34, 519 S.E.2d at 312.  In *Sara Lee*, the North Carolina Supreme Court held that the employee's fraudulent actions were in or affecting commerce because the employee was selling products to his employer from his separately owned business, which constituted typical "buyer-seller relations in a business setting" between distinct corporate entities.  351 N.C. at 33, 519 S.E.2d at 312.  In contrast, in *White*, the Supreme Court held that the employee's alleged deceptive actions were not "in or affecting commerce" because the employee had "deceptively interacted only with his partners," meaning the "conduct occurred completely within the . . . partnership."  364 N.C. at 54, 691 S.E.2d at 680.

29.     Contrasting *White* and *Sara Lee*, the Court of Appeals in *Alexander* held that a defendant's unlawful acts were not in or affecting commerce where the defendant used company funds to pay for his own personal expenses, because the payments that he made to himself were "more properly classified as the misappropriation of corporate funds within a single entity rather than commercial transactions between separate market participants 'in or affecting commerce.'" *Alexander*, 792 S.E.2d at 905.

30.     The Court concludes that Defendants' alleged acts, which form the basis for Plaintiffs' UDTP claim, are more analogous to the actions in *White* and *Alexander* and were not in or affecting commerce. Urquhart's termination involved solely internal conduct that occurred within InterCon. Likewise, even if Trenkelbach wrongfully diverted InterCon funds, that act was not in or affecting commerce, because the alleged activity was confined to acts of an owner and one single entity.

31.     Finally, even if Defendants prevented the completion of the Succession Plan, that act was not in or affecting commerce because the Succession Plan is an internal agreement between managing members of InterCon, and violations of that agreement, if any, occurred completely within the internal affairs of the corporation. The Court concludes that Plaintiffs mischaracterize the facts when they contend that the Succession Plan must be considered a sale of a company in commerce because the relationship between Urquhart and Trenkelbach was no more than "a fictitious relationship that would not exist but for plaintiff and defendants' buyer-seller relationship." *Gress v. Rowboat Co.,* 190 N.C. App. 773, 777, 661 S.E.2d 278, 282

(2008) (holding that the presumption against UDTP claims between employers and employees does not apply when the employer–employee relationship was formed after the parties entered into a written purchase agreement and solely for the purpose of the plaintiff–buyer observing the company's operations).

32.     In sum, while Plaintiffs may ultimately succeed on their other claims, they have not sufficiently stated a UDTP claim as a matter of law because, as alleged, the unfair or deceptive acts were not in or affecting commerce.

B. <u>Plaintiffs' Tortious Interference With Contract Claim Must Be Dismissed Because the Amended Complaint Does Not Provide a Basis for Finding that Trenkelbach Acted With Malice or Without Justification.</u>

33.     The elements of a claim for tortious interference with contract are

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*Privette v. Univ. of N.C. at Chapel Hill*, 96 N.C. App. 124, 134, 385 S.E.2d 185, 190 (1989) (quoting *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988)).

34.     The Court notes that both Trenkelbach and Urquhart are parties to the Operating Agreement and the Memorandum of Agreement.  Therefore, Plaintiffs cannot maintain a tortious interference with contract claim against Trenkelbach for either of those contracts, because a person cannot interfere with his own contract. *See, e.g.*, *Wagoner v. Elkin City Schs.' Bd. of Educ.*, 113 N.C. App. 579, 587, 440 S.E.2d 119, 124 (1994) (explaining that the plaintiff could not maintain an action

against two of the defendants for tortious interference with contract because the defendants were parties to the contract (first citing *Smith v. Ford Motor Co.*, 289 N.C. 71, 87, 221 S.E.2d 282, 292 (1976); then citing *Elmore v. Atl. Coast Line R.R. Co.*, 191 N.C. 182, 187, 131 S.E. 633, 636 (1926))).

35.     The Amended Complaint also fails to state a tortious interference claim based on the Employment Contract because it fails to demonstrate that Trenkelbach acted without justification.  A party acts "without justification" when he acts with malice and his actions are "not reasonably related to the protection of a legitimate business interest." *Privette*, 96 N.C. App. at 134, 385 S.E.2d at 190 (quoting *Smith*, 289 N.C. at 94, 221 S.E.2d at 292).  The pleading standards for a tortious interference with contract claim are strict.  To sufficiently allege that a party acted without justification, the complaint must provide "a factual basis to support the claim of malice." *Pinewood Homes, Inc. v. Harris*, 184 N.C. App. 597, 605, 646 S.E.2d 826, 833 (2007).  A general allegation of malice is insufficient. *See id.* "A motion under Rule 12(b)(6) should be granted when the complaint reveals that the interference was justified or privileged." *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 220, 367 S.E.2d 647, 650 (1988).  "[T]he complaint must admit of no motive for interference other than malice." *Filmar Racing, Inc. v. Stewart*, 141 N.C. App. 668, 674, 541 S.E.2d 733, 738 (2001); *see also, e.g., Bochkis v. Med. Justice Servs., Inc.*, No. 16 CVS 6434, 2016 NCBC LEXIS 90, at *13 (N.C. Super. Ct. Nov. 23, 2016) (dismissing the plaintiff's tortious interference claim where the complaint demonstrated that

defendant's interference was justified because the defendant was seeking to protect its trade secrets).

36.     In *Privette v. University of North Carolina at Chapel Hill*, the plaintiff made numerous allegations that the defendants, who were directors at the university lab for which plaintiff worked, "began a pattern of har[]assment against [him]," encouraged other employees "to make false accusations" against him, and "conspired to terminate [his] employment with the University." 96 N.C. App. at 127, 385 S.E.2d at 187. The plaintiff also alleged that the defendants "conspired to make [plaintiff's] work area appear to be in much worse condition than the other work areas," and then informed him "that because he had failed to properly clean a 'surgery table' he 'would be terminated.'" *Id.* The court explained that the complaint also alleged that the defendants were directors of the lab and that those allegations "show[ed] that both [defendants] had an interest in [e]nsuring proper work procedures at the Center and as such, had a legitimate professional interest in the plaintiff's performance of his duties." *Id.* at 134, 385 S.E.2d at 191. The Court of Appeals then held that the tortious interference claim should be dismissed because the "complaint on its face admits that [the defendants] had a proper motive for their actions." *Id.*

37.     Here, the Amended Complaint alleges the following:

- "Trenkelbach used improper means or methods without justification to interfere with the Operating Agreement. . . ." (Am. Compl. ¶ 86.)

- Trenkelbach interfered with Urquhart's contracts so that he could "regain[] full ownership of [InterCon]" because InterCon "has nearly quadrupled its revenues in the past two years alone." (Am. Compl. ¶ 60.)

- Trenkelbach is a manager–member of InterCon and "any dispute between the parties over a company matter shall be decided by Trenkelbach." (Am. Compl. ¶ 29; *see also* Am. Compl. ¶¶ 20, 23.)

- Urquhart was provided with a letter "explaining that the reason for his termination 'with cause' was a loss of trust and confidence and harsh behavior." (Am. Compl. ¶ 48.)

38. These allegations may ultimately afford Plaintiffs some recovery, but they are not sufficient to demonstrate the necessary malice for a tortious interference with contract claim. Similar to *Privette*, the Amended Complaint contains allegations that support an inference that Trenkelbach acted with a legitimate business interest when he terminated Urquhart, because he took action to support his own interest in, and management responsibility for, InterCon.

39. In sum, while Plaintiffs may ultimately prove that Urquhart's termination lacked a proper basis, Plaintiffs' claims are not actionable through a tortious interference with contract claim, which would require Plaintiffs to demonstrate that Trenkelbach had no business motive for terminating Urquhart other than malice. *See Filmar Racing, Inc.*, 141 N.C. App. at 674, 541 S.E.2d at 738.

40.     Having found the Amended Complaint deficient, the Court need not address Defendants' contention that Trenkelbach is a non-outsider entitled to qualified immunity from any tortious-interference claim.

C. <u>Urquhart Sufficiently Alleged Standing to Assert the Derivative Claims and Seek an Accounting.</u>

41.     Defendants' attack on the derivative claims presented in the Amended Complaint is limited to the contention that Urquhart has no standing to bring derivative claims because only a member of InterCon can bring a derivate claim.

42.     N.C. Gen. Stat. § 57D-8-01 provides that "*a member* may bring a derivative action" if "the member was a member of the LLC at the time of the act or omission for which the proceeding is brought" and other prerequisites have been met, such as a written demand.  N.C. Gen. Stat. § 57D-8-01(a)(1) (2015) (emphasis added). This provision has been construed to require that the derivative plaintiff be a member both at the time of the act and at the time the suit is filed.  *See Alford v. Shaw*, 327 N.C. 526, 534, 398 S.E.2d 445, 449 (1990) (explaining that a derivative plaintiff who attempts to sue a corporation must have been a shareholder at the time the underlying act occurred and at the time the complaint was filed); Russell M. Robinson, II, *Robinson on North Carolina Corporation Law* § 34.04[5], at 34-27 (7th ed. 2016) ("A derivative action on behalf of an LLC will be governed by essentially the same rules that apply to a derivative action on behalf of a corporation.").

43.     The parties dispute whether Urquhart's employment was validly terminated, leading to IBC's proper exercise of its purchase option and Urquhart's loss of membership in InterCon.  Accordingly, the determination whether Urquhart

has standing to bring derivative claims must await resolution of the disputed termination issue.

44.     Likewise, Urquhart's accounting claim must be resolved through subsequent proceedings.  Defendants' challenge to Urquhart's accounting claim rests solely on the issue whether Urquhart is a member of InterCon.  Therefore, the Court's ruling is limited to that issue and does not further address the question whether a member of an LLC, like a partner in a general partnership, may bring an accounting claim.  Urquhart's claim for a pro rata recovery is alleged as part of his accounting claim and depends upon his status as a member of InterCon, thus the Court does not address that claim at this time.

## V.     CONCLUSION

45.     Based on the reasons explained above, the Court holds as follows:

1)     The Motion is GRANTED as to Plaintiffs' claim of unfair or deceptive trade practices, and that claim is DISMISSED WITH PREJUDICE.

2)     The Motion is GRANTED as to Plaintiffs' claim of tortious interference with contract, and that claim is DISMISSED WITH PREJUDICE.

3)     The Motion is DENIED as to Urquhart's accounting claim and the derivative claims.

IT IS SO ORDERED, this the 8th day of February, 2017.


                                          /s/ James L. Gale
                                         _____
                                         James L. Gale
                                         Chief Business Court Judge