**Kurt J. LINDNER, Edith Lindner; St. Joseph Hospital of Kirkwood; Admiral Insurance Agency; Lindner Fund, Inc.; Petty & Company; Landmark Central Bank & Trust Company, Appellants,**

v.

**DURHAM HOSIERY MILLS, INC.; George A. Cralle; H.E. Schoenhut, Jr.; W.K. Bigelow; H.E. Rodenhizer; W.C. Spann and John P. Barnett, individually, Appellees.**

No. 84–1593.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 10, 1985.

Decided May 6, 1985.

William Woodward Webb, Raleigh, N.C. (Broughton, Wilkins & Webb, P.A., Raleigh, N.C., Kevin P. Roddy, Smith, Taggart, Gibson & Albro, Charlottesville, Va., on brief), for appellants.

G. Eugene Boyce, Raleigh, N.C. (Susan K. Burkhart, Boyce, Mitchell, Burns & Smith, P.A., Raleigh, N.C., on brief), and L. Bruce McDaniel, Raleigh, N.C. (DeBank, McDaniel, Heidgard & Holbrook, Raleigh, N.C., on brief), for appellees.

Before RUSSELL and CHAPMAN, Circuit Judges and HAYNSWORTH, Senior Circuit Judge.

CHAPMAN, Circuit Judge:

This appeal arises out of the merger and reorganization of Durham Hosiery Mills, Inc. (Durham Hosiery), a North Carolina corporation, into DHM, Inc., a Virginia corporation, on January 15, 1981.[1] The plaintiffs brought this diversity action alleging that the defendants had deprived them of the fair market value of their stock by virtue of a reverse stock split accomplished as a part of the merger. The plaintiffs appeal from the decision of the district court dismissing their claim for relief under the North Carolina Unfair Trade Practices Act, *N.C.Gen.Stat.* § 75–1.1 (1981), and denying their motion for a new trial on their claim for breach of fiduciary duty. We affirm.

I

The plaintiffs are former minority shareholders who owned Class B nonvoting stock in Durham Hosiery. All of the plaintiffs are citizens and residents of the State of Missouri. Defendant Durham Hosiery was a hosiery manufacturer incorporated in North Carolina with plants located, at one time, in both North Carolina and Virginia. Defendants Bigelow, Rodenhizer, and Spann were directors of Durham Hosiery.

In August 1980 a New York stockbroker contacted the president of Durham Hosiery, defendant George Cralle, and offered him a large block of stock. The broker was asking $7 a share for the Class B stock and $12 a share for the Class A stock. Cralle contacted John P. Barnett, an acquaintance who had negotiated the sale of the Danville plant to Durham Hosiery, and offered him the opportunity to acquire this block of stock.

After many discussions, Barnett authorized Cralle, who had personally dealt with the New York stockbroker, to negotiate the purchase of the Durham Hosiery stock. On November 7, 1980, Barnett purchased through Cralle 25,705 shares of Class B and 2,483 shares of Class A stock from the New York stockbroker. Because the number of outstanding Durham Hosiery shares was 71,101, this transaction represented a purchase by Barnett of 40 percent of the company's stock. The majority of the company's shares was owned by Cralle and Harry S. Schoenhut, the vice president of Durham Hosiery.

Cralle and Schoenhut had been employees of Durham Hosiery for 28 years and 13 years, respectively. Before these transactions occurred, the Board of Directors of Durham Hosiery had discussed and concluded that the company would provide retirement benefits for Cralle and Schoenhut. When Barnett began acquiring stock in Durham Hosiery and reorganization discussions began, Cralle requested that Barnett honor the company's obligation to fund the retirement plans that he and Schoenhut had anticipated. Barnett agreed that after the merger Schoenhut would receive deferred compensation of $500,000 for consulting services to the corporation. Cralle received similar assurances, and also an option to sell to Barnett his shares of Durham Hosiery. By the time of the merger, Barnett had accumulated a majority of the Durham Hosiery stock.

After Cralle and Barnett discussed their intentions for the reorganization of Durham Hosiery, Barnett arranged a meeting with attorney Frederick R. Russell. Russell advised Barnett and Cralle to reduce substantially the number of Durham Ho-

---

1. This action is but one of several in the federal courts arising out of the merger and reorganization of Durham Hosiery Mills, Inc. In *White v. Durham Hosiery Mills, Inc.,* 753 F.2d 1072 (4th Cir.1985), another panel of this Court affirmed a jury verdict awarding a former minority shareholder compensatory damages of $25,900 and punitive damages of $50,000 on his action for misrepresentation under Rule 10b–5, 17 C.F.R. § 240.10b–5 (1983). Two actions brought by five other shareholders are presently pending in the United States District Court for the Middle District of North Carolina. *See Umstead v. Durham Hosiery Mills, Inc.,* 578 F.Supp. 342 (M.D.N.C.1984); *Teer v. Durham Hosiery Mills, Inc.,* 592 F.Supp. 1269 (1984).

siery shareholders to enable the company to raise one million dollars of working capital through personal guarantees. Russell also recommended that Durham Hosiery eliminate nonvoting stock. Finally, they agreed to a plan by which those shareholders interested in remaining in the corporation had to accumulate 4,500 shares in the old corporation to acquire one share in the new corporation. The new corporation would have only 16 shares of stock. Holders of fewer than 4,500 Durham Hosiery shares were either to purchase sufficient shares to bring the total to 4,500, or to sell their shares at a price determined by bids received by the corporation from holders seeking more shares.

Durham Hosiery mailed to its shareholders a Proxy Statement and other documents, prepared by Russell, containing descriptions of the proposed merger and reorganization. According to the Proxy Statement, shareholders objecting to the merger could dissent and seek appraisal of and payment for their shares in the corporation by complying with the "Virginia Stock Corporation Act (or the similar provision of North Carolina law)." Cralle read the documents and signed the Proxy Statement.

On December 22, 1980, the Board of Directors of Durham Hosiery voted unanimously in favor of the plan for reorganization and merger. At a special meeting on January 12, 1981, the Durham Hosiery shareholders approved the merger by an affirmative vote of 80 percent or more of each class of outstanding stock.[2] The plaintiffs dissented from the proposed merger and reorganization, executing their proxies on December 27, 1980. The Articles of Merger of Durham Hosiery Mills and DHM, Inc. were filed with the Secretary of State of North Carolina on January 15, 1981, and the merger was effected.

On January 19, 1981, Durham Hosiery sent a letter to the plaintiffs and other Durham Hosiery shareholders explaining that the merger had been overwhelmingly approved and that the merger was effective. The letter, signed by Cralle, also instructed the shareholders to execute an enclosed form for disposing of fractional interests in the stock and requested return of the stock certificates in accordance with the plan for payment. The plaintiffs did not respond to this letter. On February 23, 1981, Durham Hosiery sent another letter to the plaintiffs instructing them to submit their stock certificates in order to receive $7 per share of stock. The plaintiffs again failed to submit their stock certificate for payment.

In April 1981 the plaintiffs filed an action in the Wake County Superior Court of North Carolina seeking a determination of the fair value of Durham Hosiery stock. This state appraisal action was pending on December 23, 1981, when the plaintiffs filed the present action for damages in the district court. That action is still pending in the North Carolina state court.

In this action the plaintiffs alleged causes of action for (1) violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982), and Security Exchange Commission (SEC) Rule 10b–5, 17 C.F.R. 240.10b–5 (1984); (2) constructive fraud; (3) breaches of fiduciary duty; (4) violations of the North Carolina Securities Act, N.C.Gen.Stat. § 78A–56(b) (1981); (5) unfair or deceptive acts or practices in violation of N.C.Gen.Stat. § 75–1.1 (1981); and (6) violations of the North Carolina Dissenters' Rights Statute, N.C.Gen.Stat. §§ 55–108, 113 (1981). In two separate memoranda opinions the district court dismissed all of the plaintiffs' claims except their claim for breach of fiduciary duty. On January 12, 1984, the plaintiffs amended their complaint to allege a cause of action under the civil damages provision of the Racketeer Influenced and Corrupt Or-

---

**2.** On January 9, 1981, plaintiff Lindner filed a complaint in the district court for the Western District of Virginia for the purpose of obtaining an injunction to postpone the shareholder meeting scheduled for January 12. On the morning of January 12, however, the district court concluded that Lindner had failed to show any irreparable injury from the holding of the meeting and the merger due to the availability of his appraisal remedy under state law.

ganizations (RICO) Act, 18 U.S.C. §§ 1961–68 (1982).

After twelve days of testimony the jury found that the defendants had not committed a breach of fiduciary duty and that they had not violated the provisions of the RICO Act. The district court denied the plaintiffs' motion for a new trial and entered judgment in accordance with the jury's verdict. This appeal followed.

## II

The first issue presented is whether *N.C.Gen.Stat.* § 75–1.1 applies to securities transactions. The plaintiffs argue that the defendants' conduct constituted an unfair or deceptive act or practice in violation of § 75–1.1. The district court dismissed this claim and held that "the instant merger transaction does not fall within the scope of N.C.Gen.Stat. Sec. 75–1.1." It stated that § 75–1.1 "is directed toward misrepresentation and shady practices sometimes associated with the marketing of goods and services, and that the deterrent of such practices for the protection of the general public is the reason that ... [§] 75–16 entitled the person injured by such acts to treble damages." The district court reasoned that § 75–1.1 has no application to a securities fraud case involving a corporate merger because such an application is inconsistent with the purpose behind the enactment of § 75–1.1.

Because the North Carolina Unfair Trade Practices Act does not refer to securities transactions and the North Carolina courts have not addressed this issue, we must ascertain what the North Carolina Supreme Court would decide if confronted with this question. Our inquiry is guided by the purpose behind § 75–1.1, the North Carolina cases limiting the scope of § 75–1.1, other state cases construing similar statutes, and the scope of § 5 of the Federal Trade Commission (FTC) Act, 15 U.S.C. § 45(a)(1) (1982).

Section 75–1.1(a) declares that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are ...

unlawful." There are only two express exclusions contained in the statute. Subsection (b) excludes professional services rendered by a member of a learned profession. Subsection (c) excludes the advertising media when the owner, agent or employee who published the material did not have knowledge of the false, misleading or deceptive character of the advertisement and did not have a direct financial interest in the sale or distribution of the advertised product or service. This Court previously has observed that the "prohibitory scope of the North Carolina [Unfair Trade Practices Act] ... is potentially quite broad." *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 48 n. 10 (4th Cir.1983), *aff'd on rehearing*, 742 F.2d 170 (4th Cir.1984) (citing *Atlantic Purchasers, Inc. v. Aircraft Sales, Inc.*, 705 F.2d 712, 716–17 (4th Cir.1983)). Nevertheless, the scope of § 75–1.1 is not unlimited.

The apparent purpose behind the enactment of § 75–1.1 was the protection of the consuming public. In *Marshall v. Miller*, 302 N.C. 539, 276 S.E.2d 397 (1981), the North Carolina Supreme Court stated:

> In an area of law such as this, we would be remiss if we failed to consider also the overall purpose for which this statute was enacted. The commentators agree that state statutes such as ours were enacted to supplement federal legislation, so that local business interests could not proceed with impunity, secure in the knowledge that the dimensions of their transgression would not merit federal action.

*Id.* at 549, 276 S.E.2d at 403. The North Carolina Supreme Court also stated that "[i]n enacting [§ 75–1] and [§ 75–1.1], our Legislature intended to establish an effective private cause of action for aggrieved consumers in this State" because "common law remedies had proved often ineffective." *Id.* at 543, 276 S.E. at 400. Moreover, the commentators agree that the North Carolina Unfair Trade Practices Act grew out of antitrust laws in an effort to protect the consuming public from anticompetitive business practices. *See* Morgan, The Peo-

ple's Advocate in the Marketplace—The Role of the North Carolina Attorney General in the Field of Consumer Protection, 6 Wake Forest L.Rev. 1, 12 (1969). The North Carolina Supreme Court's discussion of the purpose behind § 75–1.1, although not dispositive of this case, gives some guidance on the potential scope of that section.

Two North Carolina cases have limited the potential scope of § 75–1.1. In *Bache Halsey Stuart, Inc. v. Hunsucker*, 38 N.C. App. 414, 248 S.E.2d 567 (1978), *cert. denied*, 296 N.C. 583, 254 S.E.2d 32 (1979), the North Carolina Court of Appeals held that commodities transactions are not within the ambit of § 75–1.1. The court held that the "pervasive" federal scheme for regulating commodities transactions militated against finding a state cause of action under § 75–1.1. The court also recognized that a finding that one party's conduct violated § 75–1.1 would expose it to a host of legislatively created sanctions in addition to those sought in the suit. Based on these concerns, the court held that "Congress has clearly expressed its intent to exercise exclusive jurisdiction over the activity of the commodity exchanges and has provided elaborate administrative procedures for the redress of grievances" pursuant to the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* (1976). 38 N.C.App. at 418, 248 S.E.2d at 570.

Similarly, in *Buie v. Daniel International Corp.*, 56 N.C.App. 445, 289 S.E.2d 118 (1982), *cert. denied*, 305 N.C. 759, 292 S.E.2d 574 (1982), the North Carolina Court of Appeals held that employer-employee relationships did not fall within the intended scope of § 75–1.1. The court reasoned that "[e]mployment practices fall within the purview of other statutes adopted for that express purpose." 56 N.C.App. at 448, 289 S.E.2d at 120. Although neither *Hunsuck-*

*er* nor *Buie* are directly dispositive of this case, both cases stand for the proposition that the presence of other federal or state statutory schemes may limit the scope of § 75–1.1.

We find it significant that no state court has held that its Unfair Trade Practices Act applies to securities transactions.[3] In fact, courts in three states, Rhode Island, South Carolina, and Washington, have held that their state Unfair Trade Practices Act has no application to securities transactions. *State v. Piedmont Funding Corp.*, 119 R.I. 695, 382 A.2d 819 (1978); *State ex rel. McLeod v. Rhoades*, 275 S.C. 104, 267 S.E.2d 539 (1980); *Kittilson v. Ford*, 23 Wash.App. 402, 595 P.2d 944 (1979), *aff'd*, 93 Wash. 223, 608 P.2d 264 (1980). In each case the state court held that its Unfair Trade Practices Act did not apply to securities transactions because of a particular statutory provision exempting "actions or transactions permitted under laws administered by any regulatory body" of the state or the United States. Although the presence of that statutory exemption makes *Piedmont Funding, Rhodes* and *Kittilson* distinguishable from this case, those cases, together with the absence of any other state court decision holding securities transactions subject to the state's Unfair Trade Practices Act, provide some indication of the general scope of such acts.

We also find it significant that § 75–1.1 is reproduced verbatim from § 5 of the FTC Act, 15 U.S.C. § 45(a)(1) (1982), and that the courts interpreting and applying § 75–1.1 have deemed it appropriate "to look to the federal decisions interpreting the FTC Act for guidance in construing the meaning of G.S. § 75–1.1." *Johnson v. Phoenix Mutual Life Insurance Co.*, 300 N.C. 247, 262, 266 S.E.2d 610, 620 (1980) (citing *Hardy v. Toler*, 288 N.C. 303, 218 S.E.2d 342 (1975)). *See also ITCO Corp.*

---

**3.** *But see Hickey v. Howard*, 598 F.Supp. 1105 (D.Mass.1984) (holding that Massachusetts statute proscribing unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce, and providing for treble damages, is applicable to securities transactions); *Mitchelson v. Aviation Simu-* *lation Technology, Inc.*, 582 F.Supp. 1 (D.Mass. 1983) (same). However, two other judges in the United States District Court for the District of Massachusetts have held that this Massachusetts statute does not apply to securities transactions. *See Moseley* and *Sweeney, infra*.

*v. Michelin Tire Corp.*, 722 F.2d 42, 48 (4th Cir.1983), *aff'd on rehearing*, 742 F.2d 170 (4th Cir.1984). Thus, the fact that no federal court decision has applied § 5(a)(1) of the FTC Act to securities transactions is additional evidence of the scope of § 75–1.-1.[4] Moreover, at least one district court has relied upon the scope of § 5(a)(1) of the FTC Act in holding that securities transactions were not subject to a Massachusetts statute which prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." *Conkling v. Moseley, Hallgarten, Estabrook & Weeden, Inc.*, 575 F.Supp. 760, 761 (D.Mass.1983) (interpreting *Mass.Gen.Laws Ann.* ch. 93A § 2(a) (1972)). *Accord, Sweeney v. Keystone Provident Life Insurance Co.*, 578 F.Supp. 31, 35 (D.Mass.1983).[5]

The plaintiffs argue that § 75–1.1 applies to securities transactions because North Carolina courts have applied that section in a variety of commercial settings. *See, e.g., Johnson v. Phoenix Mutual Life Insurance Co.*, 300 N.C. 247, 266 S.E.2d 610 (1980) (transaction between a mortgage broker and a borrower for the exclusive right to place permanent mortgage financing); *Kent v. Humphries*, 50 N.C.App. 580, 275 S.E.2d 176 (1981), *aff'd and modified*, 303 N.C. 675, 281 S.E.2d 43 (1981) (rental of commercial property); *Ellis v. Smith-Broadhurst, Inc.*, 48 N.C.App. 180, 268 S.E.2d 271 (1980) (unfair methods of competition in the insurance business). *See also United Roasters, Inc. v. Colgate-Palmolive Co.*, 485 F.Supp. 1041 (E.D.N.C. 1979), *aff'd on other grounds*, 649 F.2d 985 (4th Cir.1981), *cert. denied*, 454 U.S. 1054, 102 S.Ct. 599, 70 L.Ed.2d 590 (1981) (bulk sale of business' assets); *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42 (4th Cir.

1983), *aff'd on rehearing*, 742 F.2d 170 (4th Cir.1984) (antitrust action brought by tire dealer against tire manufacturer).[6] While it is true that North Carolina and federal courts have applied § 75–1.1 in a variety of commercial settings, that fact does not mean that § 75–1.1 applies to all commercial transactions or to securities transactions. Nor does it mean that the purposes behind the enactment of § 75–1.1 may no longer serve as some indication of its scope. In most of the cases cited above, the defendants anti-competitive conduct necessarily injured the consuming public.

We think that the North Carolina Supreme Court would hold, if presented with this issue, that securities transactions are beyond the scope of § 75–1.1. Our decision is consistent with § 75–1.1's purpose to protect the consuming public, the North Carolina cases holding that other federal or state statutes may limit the scope of § 75–1.1, the absence of any other state court decision holding that securities transactions are subject to a similar Unfair Trade Practices Act, and the absence of any federal court decision holding that securities transactions are subject to § 5(a)(1) of the FTC Act. We do not believe that the North Carolina legislature would have intended § 75–1.1, with its treble damages provision, to apply to securities transactions which were already subject to pervasive and intricate regulation under the North Carolina Securities Act, *N.C.Gen. Stat.* § 78A–1 *et seq.* (1981), as well as the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* (1982), and the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (1982). Furthermore, to hold that § 75–1.1 applies to securities transactions could subject

---

**4.** This fact makes the instant case clearly distinguishable from *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42 (4th Cir.1983), and *Bostic Oil Corp. v. Michelin Tire Corp.*, 702 F.2d 1207 (4th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 242, 78 L.Ed.2d 232 (1983). In those cases this court held that proof of conduct violative of § 1 of the Sherman Act is proof sufficient to establish a violation of the North Carolina and South Carolina Unfair Trade Practices Acts. But a key to those decisions was this court's observation that "it is an accepted tenet of basic antitrust law

that § 5 of the [FTC] Act sweeps within its prohibitory scope conduct also condemned by § 1 of the Sherman Act." *ITCO*, 722 F.2d at 48 (citing *FTC v. Cement Institute*, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948); *FTC v. Beech-Nut Packing Co.*, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922)).

**5.** *See* footnote 3, *supra.*

**6.** *See* footnote 4, *supra.*

those involved with securities transactions to overlapping supervision and enforcement by both the North Carolina Attorney General, who is charged with enforcing § 75–1.1, and the North Carolina Secretary of State, who is charged with enforcing the North Carolina Securities Act. For all of these reasons, we hold that whatever the scope of § 75–1.1, securities transactions are beyond the reach of the North Carolina Unfair Trade Practices Act.

### III

 The second issue presented is whether the district court abused its discretion in denying the plaintiffs' motion for a new trial on their claim for breach of fiduciary duty. It is well settled that "the granting or refusing of a new trial is a matter resting in the sound discretion of the trial judge, and that his action thereon is not reviewable upon appeal, save in the most exceptional circumstances." *Aetna Casualty & Surety Co. v. Yeatts*, 122 F.2d 350, 354 (4th Cir.1941); *City of Richmond v. Atlantic Co.*, 273 F.2d 902, 916–17 (4th Cir.1960). In this case the district court instructed the jury that defendants Cralle, Schoenhut, Bigelow, Rodenhizer and Spann owed a fiduciary duty to the plaintiffs as minority shareholders of Durham Hosiery "as a matter of law." *N.C.Gen.Stat.* § 55–35 (1982). The district court likewise instructed the jury that if it found that defendant Barnett was a majority shareholder of Durham Hosiery at the time the Proxy Statement was issued, a fiduciary relationship also existed between Barnett and the plaintiffs as a matter of law. The plaintiffs do not challenge the district court's charge to the jury but argue that the verdict is against the manifest weight of the evidence. Based upon our review of the record, we are unable to conclude that the district court abused its discretion in denying the plaintiffs' motion for a new trial. Accordingly, the judgment of the district court is

AFFIRMED.