Tillery Envtl., LLC v. A&D Holdings, Inc., 2017 NCBC 67.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE<br>SUPERIOR COURT DIVISION |
| MECKLENBURG COUNTY | 17 CVS 6525 |

TILLERY ENVIRONMENTAL LLC,

      Plaintiff/Counterclaim
      Defendant,

v.

A&D HOLDINGS, INC., in its
capacity as successor-by-merger to
JBC ACQUISITION INC.,

      Defendant/Counterclaim
      Plaintiff/Third-Party
      Plaintiff,

and ROSS ENVIRONMENTAL
SERVICES, INC.,

      Defendant,

v.

CHRIS WEIDENHAMMER; PAUL
TAVEIRA; JOHN RUGGIERO;
PAUL BUTSAVAGE; ERIC D.
MCMANUS; J. SCOTT PEARCE;
MICHAEL STONEMAN; GERALD
WALKER; WILLIAM EVANS;
TIMOTHY PARKER; THOMAS
MORTON; JOSEPH KEITH BURCH;
CHRISTOPHER RABLEY; J.W.
HALL, JR.; CAROL LOCK; MERI-
BETH HALL; MICHAEL R.
GRIFFIN; JONATHAN E. HALL;
KURT E. KESKINEN; DANIEL L.
MARTIN; and JEFF STURGEON,

      Third-Party Defendants.

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO DISMISS**

1.    **THIS MATTER** is before the Court upon Defendants A&D Holdings, Inc.

("A&D") and Ross Environmental Services, Inc.'s ("Ross", together with A&D,

"Defendants") motion to dismiss (the "Motion") Plaintiff Tillery Environmental LLC's

("Tillery") claim for unfair or deceptive trade practices in the above-captioned case. For the reasons stated herein, the Court **GRANTS** the Motion and **DISMISSES** Tillery's claim for unfair and deceptive trade practices with prejudice.

> *McGuireWoods, LLP, by Jodie H. Lawson and Anita M. Foss, for Plaintiff Tillery Environmental, LLC.*
>
> *Nexsen Pruet, PLLC, by Patrick D. Sarsfield, II and Kathleen Burchette, and Wickens, Herzer, Panza, Cook & Batista Co., by Richard D. Panza and Matthew W. Nakon, for Defendants A&D Holdings, Inc. and Ross Environmental Services, Inc.*

Bledsoe, Judge.

I.

BACKGROUND

2. The Court does not make findings of fact on motions to dismiss under Rule 12(b)(6), but only recites those facts included in the Complaint that are relevant to the Court's determination of the Motion.

3. This case arises out of a dispute over funds held in escrow following a merger by stock purchase between A&D and JBC Acquisition, Inc. ("JBC"), an entity Plaintiff alleges to be a "mere instrumentality and alter ego of Ross." (Compl. ¶ 7.).

4. A&D and its subsidiaries are in the business of "providing fixed facility and mobile industrial cleaning, the classification, collection, transportation and disposal of hazardous, non-hazardous, regulated or non-regulated waste, the remediation of contaminated waters and soils, the removal of underground storage tanks, waste management, and emergency response services." (Compl. Ex. A § 1.1.)

5.      On December 17, 2014, Defendant Ross memorialized in a letter of intent its proposal to acquire all A&D stock from A&D's now former shareholders (the "Pre-Merger Shareholders").[1] (Compl. ¶ 11.)

6.      The parties engaged in lengthy due diligence and addressed particular requests by Ross regarding "Pre-Merger A&D's employee health and safety policies and procedures, Pre-Merger A&D's work related injury history, information related to workers' compensation claims and insurance policies and management thereof, and Pre-Merger A&D's historical experience modification rate ("EMR")." (Compl. ¶ 12.) A business's EMR is based on the dollar amount of its worker's compensation claims, and Defendants later argued to Plaintiff that the Pre-Merger Shareholders were aware that many of A&D's regular customers would not retain A&D's services if A&D's EMR rose above 1.0. (Compl. Ex. C. 3.)

7.      On May 8, 2015, at the conclusion of the due diligence period, A&D, the Pre-Merger Shareholders, and JBC entered into a stock purchase agreement whereby JBC[2] purchased from the Pre-Merger Shareholders all of their shares in A&D. (Compl. ¶ 17.; Compl. Ex. A, hereinafter "Stock Purchase Agreement".) Under the Stock Purchase Agreement, Tillery agreed to serve as the Shareholder

---

[1]  Tillery and the Third-Party Defendants comprise all of A&D's Pre-Merger Shareholders. Tillery was the largest shareholder, owning 80% of A&D's stock. (Defs.' Mem. Supp. Mot. Dismiss Ex. 1.)

[2]  Plaintiff alleges that Ross designated JBC as Ross's "acquisition entity." (Compl. ¶ 17.) JBC was the actual purchasing party to the transaction. (Compl. Ex. A.) The Complaint indicates that the Pre-Merger Shareholders interacted exclusively with Ross throughout negotiations and due diligence. (Compl. ¶¶ 11–12, 16.)

Representative for the Pre-Merger Shareholders. (Stock Purchase Agreement §§ 1.1, 9.1.)

8. Concurrently with the execution of the Stock Purchase Agreement on May 8, 2015, Tillery, as the Shareholder Representative, and JBC also entered into an Escrow Agreement. (Stock Purchase Agreement, Statement of Purpose § D.) Pursuant to the Escrow Agreement, JBC placed $2.9 million (the "Escrow Funds") in an escrow account with Chicago Title Insurance Company (the "Escrow Agent"). (Compl. Ex. B, hereinafter "Escrow Agreement," § 1.) The Escrow Agreement ultimately required the Escrow Agent to distribute the Escrow Funds to Tillery "on November 8, 2016, net of (i) $200,000 and (ii) any claims set forth in a demand for payment delivered on or before November 8, 2016." (Compl. ¶¶ 25-27; Escrow Agreement § 3(d).)

9. The Stock Purchase Agreement provided that the Pre-Merger Shareholders would, in limited circumstances, indemnify JBC for breaches by the Pre-Merger Shareholders of their representations and warranties. (Compl. ¶ 23; Stock Purchase Agreement § 7.2(a).) In order to seek indemnification, JBC was required to "provide a written demand (a "Demand for Payment") to Escrow Agent and to [Tillery] setting forth in reasonable detail the basis of such [c]laim and the amount sought to be paid from the Escrow Fund." (Escrow Agreement § 3(b)(i).) Subject to certain exceptions, the Pre-Merger Shareholders' duty to indemnify was only triggered if JBC's losses exceeded a "basket" of $260,000, and the indemnification amount was subject to a $2.6 million cap. (Stock Purchase

Agreement § 7.4(a).)  If Tillery disputed an indemnification demand, the Escrow Agent was required to hold the Escrow Funds until it received either joint instructions or a court order directing it to distribute the funds.  (Compl. ¶ 6.)

10.    In July 2015, A&D merged with JBC, with A&D as the surviving entity. (Compl. ¶ 4; Defs.' Mem. Supp. Mot. Dismiss 2.)  On November 4, 2016, eighteen months after the stock purchase closed and four days before the Escrow Funds were to be distributed to Tillery, A&D (as JBC's successor entity) made an indemnification demand to Tillery.  (Compl. ¶ 29.)  A&D's demand sought indemnification on account of seven claims, including three workers compensation matters, which A&D claimed "will, without question, exceed any Basket and may exceed the Cap provided in the [Stock Purchase Agreement.]"  (Compl. Ex. C 2.)  The workers compensation matters appear to be essential to A&D's indemnification demand, because the monetary losses arising from the other identified claims are unlikely to exceed the $260,000 basket. (Compl. ¶ 29; Compl. Ex. C 2.)

11.    A&D's indemnification demand specifically alleged that the Pre-Merger Shareholders were required, but had failed, to disclose three workers compensation claims that were filed with A&D's workers compensation insurers in the months immediately preceding the stock purchase transaction: "(1) a February 27, 2015 back sprain reserved [in the amount of] $99,647, (2) an April 8, 2015 twisted knee reserved in the amount of $247,848, and (3) an April 16, 2015 automobile accident injury reserved in the amount of $444,051."  (Compl. Ex. C 5.)  A&D alleged in its demand that these workers compensation claims "resulted in an increase in EMR from

historical levels of near 1.0 to a projected EMR in excess of 1.4." (Compl. Ex. C 5.) A&D further asserted that it would have "re-evaluated, considered differently, or potentially abandoned" the stock purchase transaction had the Pre-Merger Shareholders disclosed these workers compensation matters. (Compl. Ex. C 3.) Finally, relying on the foregoing, A&D contended in its demand that the failure to disclose the workers compensation claims constituted fraud by the Pre-Merger Shareholders upon A&D, which is specifically excluded from any basket, cap, or limitation under the Stock Purchase Agreement and Escrow Agreement. (Compl. Ex. C 2.)

12. Tillery claims in this action that "Defendants have no good faith basis to assert a claim to the Escrow Funds" and are "improperly tie[ing] up the Escrow Funds" because they are "unhappy with A&D's financial performance due to no fault of the [Pre-Merger] Shareholders." (Compl. ¶¶ 47, 50.) Tillery contends that the workers compensation matters are not indemnifiable because (i) the Pre-Merger Shareholders made no representations and warranties in the Stock Purchase Agreement regarding workers compensation injuries or A&D's EMR, and (ii) the workers compensation claims were not filed until well after the stock purchase transaction closed. (Compl. ¶ 31.) Additionally, Tillery contends that A&D was one day late in submitting the indemnification demand in writing to the Escrow Agent. (Compl. ¶ 35.)

13. Ultimately, Tillery alleges that Defendants "are attempting to improperly gain leverage . . . to improperly extract money to make up for their poor business

management and to deprive the [Pre-Merger] Shareholders of the Escrow Funds to which they are entitled." (Pl.'s Br. Opp'n to Defs.' Mot. Dismiss 4.) The Escrow Agent continues to hold the Escrow Funds and has indicated that it will do so until it receives either a court order or joint release instructions agreed to by the parties. (Compl. ¶ 38.)

14. Tillery filed its Complaint on April 5, 2017, (i) seeking a declaratory judgment that it is entitled to the Escrow Funds and (ii) asserting a claim for unfair or deceptive trade practices pursuant to section 75-1.1 of the North Carolina General Statutes (the "UDTP claim"). Defendants answered and moved to dismiss Tillery's UDTP claim on April 21, 2017.[3] The Court held a hearing on the Motion on July 11, 2017, at which all parties were represented by counsel. The Motion is now ripe for resolution.

---

[3] Defendants' answer included as a first defense a motion to dismiss pursuant to Rule 12(b)(6), and Defendants filed on the same day a brief in support of their purported motion to dismiss. However, Defendants did not file a standalone motion, as contemplated by Business Court Rule 7.2 ("Each motion must be set out in a separate document."). At the hearing, Plaintiff's counsel indicated that it did not object to the Court's proceeding on the Motion despite Defendants' technical violation of the Business Court Rules. Plaintiff also did not object, in its brief or otherwise, to the timing of the filing of the Motion under Rule 12(b) ("A motion making any of these defenses shall be made before pleading if a further pleading is permitted."). *See Dixon v. Prudential Prime Props.*, No. 4:16-CV-233-D, 2017 U.S. Dist. LEXIS 60068, at *9 n.3 (E.D.N.C. Apr. 10, 2017) ("A party must file a Rule 12(b)(6) motion before filing an answer."). The Court then announced its oral ruling, which it memorializes herein, that it would deem the Motion timely filed and BCR 7.2 satisfied in these circumstances.

## II.

## LEGAL STANDARD

15. In ruling on a motion to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure, the Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory." *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). Additionally, when ruling on a 12(b)(6) motion, a court may properly consider documents which are attached to the complaint. *Laster*, 199 N.C. App. at 577, 681 S.E.2d. at 862.

16. Dismissal of a claim pursuant to Rule 12(b)(6) is proper "(1) when the complaint on its face reveals that no law supports [the] claim; (2) when the complaint reveals on its face the absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the complaint necessarily defeats the . . . claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985). Otherwise, "a complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970) (emphasis omitted).

## III.

## ANALYSIS

17. To state a claim for unfair or deceptive trade practices under N.C. Gen. Stat. § 75-1.1, "a plaintiff must show: (1) defendant committed an unfair or deceptive act

or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). In support of its UDTP claim, Plaintiff alleges that Defendants' demands on the Escrow Funds are unfair or deceptive because Defendants have no good faith basis to seek indemnification. (Compl. ¶ 50.) Plaintiff claims injury because it "has been deprived of the $2.7 million in Escrow Funds to which it is entitled unless it acquiesces to Defendants' demands." (Compl. ¶ 52.)

18. Defendants move to dismiss Plaintiff's UDTP claim on the grounds that (1) Plaintiff alleges a mere breach of contract without aggravating circumstances and (2) the securities exemption for section 75-1.1 claims applies to the conduct at issue.

A. Mere Breach of Contract

19. North Carolina case law is clear that a willful or intentional breach of contract is not on its own sufficiently unfair or deceptive to support a section 75-1.1 claim. *Mitchell v. Linville*, 148 N.C. App. 71, 75, 557 S.E.2d 620, 623–24 (2001) (reversing judgment where plaintiff's section 75-1.1 claim was premised on defendants' breach of warranty). A breach of contract must be accompanied by aggravating circumstances—which may include "forged documents, lies, and fraudulent inducements"—to elevate it to an unfair or deceptive trade practice. *Forest2Market, Inc. v. Arcogent, Inc.*, 2016 NCBC LEXIS 3, at *14 (N.C. Super. Ct. Jan. 5, 2016); *see Garlock v. Henson*, 112 N.C. App. 243, 246, 435 S.E.2d 114, 115–16 (1993) (holding that defendant's forged bill of sale and three-year deception to deprive plaintiff of sale proceeds constituted substantial aggravating circumstances);

*Flanders/Precisionaire Corp. v. Bank of N.Y. Mellon Trust Co.*, 2015 NCBC LEXIS 36, at *39 (N.C. Super. Ct. Apr. 7, 2015) (noting that substantial aggravating circumstances may exist where the defendant makes a promise it intends to break).

20. Defendants argue that Tillery's allegations, taken as true, "amount to, at most, nothing more than a breach of contract." (Defs.' Mem. Supp. Mot. Dismiss 6.) In support of that contention, Defendants note that Tillery has not alleged any conduct that could be construed as aggravating circumstances, such as an intent by A&D at the time it entered into the contracts to wrongfully withhold the Escrow Funds. (Defs.' Mem. Supp. Mot. Dismiss 6.)

21. The Complaint, however, does not assert a claim for breach of the Stock Purchase Agreement or the Escrow Agreement or otherwise allege that Defendants have acted inconsistently with their contract obligations. Indeed, Plaintiff argues that the allegations underlying its UDTP claim are not that Defendants have failed to perform their contractual obligations, but rather that Defendants have sought to wrongfully and deceptively manipulate the indemnification demands permitted under the Stock Purchase Agreement and Escrow Agreement to claim the Escrow Funds. As such, the Court does not find the "aggravating circumstances" line of cases applicable on the specific facts alleged here. Nevertheless, to the extent Defendants' "aggravating circumstances" argument is simply a contention that Plaintiff has failed to allege unfair or deceptive conduct under section 75-1.1, the Court elects not to decide that issue in light of the Court's resolution of the motion under the securities exemption as discussed below.

B. Securities Exemption

22. Defendants next argue that Plaintiff's UDTP claim must be dismissed because it falls within the "securities exemption," which holds that securities transactions are not "in or affecting commerce" under section 75-1.1. *DeGorter v. Capitol Bancorp Ltd.*, 2011 NCBC LEXIS 29, at *10 (N.C. Super. July 29, 2011).

23. The Supreme Court of North Carolina first held that "securities transactions are beyond the scope of N.C.G.S. 75-1.1" in *Skinner v. E.F. Hutton & Co.*, 314 N.C. 267, 274, 333 S.E.2d 236, 241 (1985). *Skinner* reasoned that securities transactions are "already subject to pervasive and intricate regulation under the North Carolina Securities Act," and that subjecting securities transactions to section 75-1.1 protections "could subject those involved with securities transactions to overlapping supervision and enforcement." *Id.* at 275, 333 S.E.2d at 241 (quoting *Lindner v. Durham Hosiery Mills, Inc.*, 761 F.2d 162 (4th Cir. 1985)).

24. The Supreme Court later expanded the rationale for the securities exemption in *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 403 S.E.2d 483 (1991). In *HAJMM*, the Supreme Court affirmed its ruling in *Skinner* that securities transactions are beyond the scope of section 75-1.1 because of the risk of overlapping enforcement and liability in the securities realm. *Id.* at 592, 403 S.E.2d at 493. However, the Court further held that the pervasive regulation of securities was not the only basis for applying the securities exemption:

> Another reason is that the legislature simply did not intend for the trade, issuance and redemption of corporate securities or similar financial instruments to be transactions "in or affecting commerce" as those terms are used in N.C.G.S. § 75-1.1(a). Subsection (b) of this

section of the Act defines the term "commerce" to mean "business activities." "Business activities" is a term which connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized.

Issuance and redemption of securities are not in this sense business activities. The issuance of securities is an extraordinary event done for the purpose of raising capital in order that the enterprise can either be organized for the purpose of conducting its business activities or, if already a going concern, to enable it to continue its business activities. Subsequent transfer of securities merely works a change in ownership of the security itself. . . .

Securities transactions are related to the creation, transfer, or retirement of capital. Unlike regular purchase and sale of goods, or whatever else the enterprise was organized to do, they are not "business activities" as that term is used in the Act. They are not, therefore, "in or affecting commerce," even under a reasonably broad interpretation of the legislative intent underlying these terms.

*Id.* at 594, 403 S.E.2d at 493. Thus, *HAJMM* expanded the securities exemption by holding that securities transactions do not fall within the definition of "business activities," and therefore "commerce," under section 75-1.1. *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 303, 603 S.E.2d 147, 161 (2004) (describing *HAJMM* as an expansion of the securities exemption as set forth in *Skinner*).

25. Under *Skinner* alone, Plaintiff's UDTP claim would likely survive. Plaintiff's allegations focus on Defendants' alleged post-closing attempts to lay claim to the Escrow Funds through improper indemnification demands a year and a half after the stock purchase closed. Although this action arose out of the sale of securities, Plaintiff's allegations of post-closing misconduct under the Escrow Agreement do not appear to involve conduct "already subject to pervasive and intricate regulation under the North Carolina Securities Act, N.C. Gen. Stat. § 78A-

1 *et seq.* (1981), as well as the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* (1982), and the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq*. (1982)." *Skinner*, 314 N.C. at 275, 333 S.E.2d at 241 (quoting *Lindner*, 761 F.2d at 167–68).

26. Nevertheless, Plaintiff's section 75-1.1 claim must fail because the Court concludes that the alleged conduct does not fall within the definition of "business activities" and thus "commerce" as set forth in *HAJMM*. *See White*, 166 N.C. App. at 304, 603 S.E.2d at 161 ("Under *HAJMM,* the question is whether the transactions at issue involved securities or other financial instruments involved in raising capital.").

27. Although Defendants' allegedly wrongful conduct occurred nearly eighteen months after the securities transaction closed, Defendants' conduct is inextricably tied to the sale of securities and the Stock Purchase Agreement. The Escrow Fund was deducted from A&D's closing payment. (Stock Purchase Agreement § 7.8(a).) The Stock Purchase Agreement contains the Pre-Merger Shareholders' representations and warranties, breaches of which entitle A&D to seek indemnification. (Stock Purchase Agreement §§ 3.1–3.5.) The Stock Purchase Agreement also contains most of the substantive terms regarding indemnification. (Stock Purchase Agreement §§ 7.1–7.10.) Thus, determining whether or not A&D's indemnification demands are improper and intended to strong-arm the Pre-Merger Shareholders, as Plaintiff alleges, will necessarily require consideration of the terms of the Stock Purchase Agreement and the sale of securities to A&D.

28. Moreover, the alleged conduct here does not "connote[] the manner in which businesses conduct their regular, day-to-day activities, or affairs." *HAJMM,* 328 N.C.

at 594, 403 S.E.2d at 493. Defendants' alleged actions—making improper indemnification demands under a specific Stock Purchase Agreement and Escrow Agreement—are not indicative of a business's regular, day-to-day activities or affairs. Indeed, the indemnification demands made here can only occur once between these parties; after the Escrow Agent has made a final distribution of the Escrow Funds, the parties will have no further ongoing relationship. *See Latigo Invs. II, LLC v. Waddell & Reed Fin., Inc.*, 2007 NCBC LEXIS 17, at *11 (N.C. Super. Ct. June 11, 2007) ("[T]he Court's proper focus under the relevant cases is . . . 'what is the purpose of the transaction.'")

29. As such, the Court concludes that the conduct underlying Plaintiff's UDTP claim constitutes an "extraordinary event" tied to the "change in ownership of the security itself." *HAJMM*, 328 N.C. at 594, 403 S.E.2d at 493. *See also White v. Thompson*, 364 N.C. 47, 52, 691 S.E.2d 676, 679 (2010) (explaining that section 75-1.1 is intended to target conduct between market participants); *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 62, 554 S.E.2d 840, 848 (2001) (affirming dismissal of a section 75-1.1 claim under *HAJMM* because the loan agreement at issue also included an option to purchase stock and was therefore a capital-raising device); *Latigo*, 2007 NCBC LEXIS 17, at *12 (applying *HAJMM* to dismiss a 75-1.1 claim where the defendants reneged on an agreement to purchase an ownership stake in plaintiff's company).

30. Based on the foregoing, the Court concludes that the facts alleged in the Complaint to support Plaintiff's section 75-1.1 claim do not describe the parties'

regular, day-to-day business activities. Thus, under *HAJMM*, Plaintiff has failed to allege conduct "in or affecting commerce" under section 75-1.1, requiring dismissal of Plaintiff's UDTP claim.

IV.

CONCLUSION

31. For the foregoing reasons, Defendants' Motion to Dismiss is hereby **GRANTED.** Plaintiff's claim for violation of N.C. Gen. Stat. § 75-1.1 *et seq.* is hereby **DISMISSED** with prejudice.

**SO ORDERED**, this the 4th day of August, 2017.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Special Superior Court Judge
 for Complex Business Cases